# In re CONDEMNATIONS FOR IMPROVEMENT OF ROUGE RIVER.

(District Court, E. D. Michigan, S. D.    May 21, 1920.)

Nos. 6157, 6212, 6213.

1. **Eminent domain ⊚⟞74—Actual payment of compensation in advance of taking not required.**
    While private property cannot be taken, even under the right of eminent domain, unless necessary for public use, and then only if just compensation be paid therefor, yet it is not necessary, in the absence of express constitutional or statutory requirement to that effect, that such compensation be paid before the actual taking of the property, provided that reasonably certain, prompt, and adequate provision for the payment of just compensation be made, or the public faith and purse be pledged for such payment.

2. **Eminent domain ⊚⟞66—Whether use is public use is judicial question.**
    Whether the use for which property is sought to be taken is a public use is a judicial question.

3. **Eminent domain ⊚⟞24—Necessary use of property by United States for improvement of navigability of river is public use.**
    The use of property by the United States, when necessary for the purpose of improving the navigability of a navigable river within its jurisdiction, is a public use, for which it is entitled to take such property by the power of eminent domain.

4. **Eminent domain ⊚⟞14—That public use will benefit some more than others is immaterial.**
    The mere fact that the taking of property for a public use will result in greater benefit to some persons than to others, or that private individuals

contribute to the expense of such taking, does not affect the character of such use, or render it any the less public, within the meaning and scope of the law of eminent domain.

**5. Eminent domain ⚖️67—Necessity of taking is legislative question.**

If the use for which any particular property is sought to be taken is a public use, the question whether such property is necessary for such use is a legislative question, and the determination thereof by the proper legislative body cannot be questioned in condemnation proceedings.

**6. Constitutional law ⚖️281—Eminent domain ⚖️167 (2)—Hearing on necessity of taking not essential to due process of law.**

A hearing on the necessity of taking property for a public use is not essential to due process of law in the sense of the Fourteenth Amendment.

**7. Constitutional law ⚖️62—Eminent domain ⚖️68—Power to determine necessity of taking may be delegated to executive officer; exercise of delegated power not reviewable.**

The power to determine the question of the necessity of taking property for a public use may be delegated by Congress to executive officers of the government. The finding by such officers on this question, made in the exercise of such delegated power, is not subject to review by the courts.

**8. Eminent domain ⚖️6—Statute authorizing condemnation by government not unconstitutional, because compensation is paid by others.**

Act May 16, 1906, as amended by Act June 29, 1906 (Comp. St. § 9881), providing that, whenever any person, company, or corporation shall undertake to secure any land needed for river or harbor improvement for the purpose of conveying the same to the United States free of cost, and shall be unable for any reason to obtain the same by purchase, the Secretary of War may in his discretion cause proceedings to be instituted in the name of the United States for its condemnation, the expenses and award to be paid by such person, company, or corporation *held* not unconstitutional, as delegating the power of eminent domain to private parties; the land being acquired by the government, and it being immaterial and no concern of the owners what arrangement it may have with others for payment of the compensation.

**9. Eminent domain ⚖️75—Petition for condemnation by United States, offering security for payment of compensation, sufficient.**

Petition by the United States for condemnation of land for a river improvement, which offers to give such security for the payment of the compensation awarded as shall be required by the court, *held* sufficient under Act July 18, 1918, § 5 (Comp. St. Ann. Supp. 1919, § 9878a).

**10. Eminent domain ⚖️68—Determination of necessity under power delegated by Congress conclusive.**

Under Act May 16, 1906, as amended by Act June 29, 1906 (Comp. St. § 9881), vesting in the Secretary of War discretion to institute proceedings to condemn land for a river or harbor improvement, such discretion includes power to determine the necessity for taking the land, and his decision thereon is conclusive, and not affected by a state statute requiring such question to be determined by a jury.

**11. Eminent domain ⚖️167 (1)—Conformity provision as to suits by United States relates to procedure only.**

The provision of Act April 24, 1888 (Comp. St. § 9878), requiring proceedings by the Secretary of War for condemnation of land for river or harbor improvement to be prosecuted in accordance with the laws of the state, relates to procedure, and not to matters of substance.

**12. Eminent domain ⚖️170—Inability to purchase not condition precedent to condemnation proceedings by United States.**

In proceedings by the United States for condemnation of land for a public use inability to acquire title by purchase is not a jurisdictional condition precedent, unless expressly made so by statute.

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. In the matter of petitions by the United States for condemnation of private property for the Improvement of Rouge River, a public use. On motions to dismiss. Denied.

Alfred J. Murphy and Howell Van Auken, Sp. Assts. Atty. Gen., for petitioner.

A. C. Angell, Stevenson, Carpenter, Butzel & Backus, Campbell, Bulkley & Ledyard, Miller, Canfield, Paddock & Perry, Keena, Lightner, Oxtoby & Hanley, Corliss, Leete & Moody, Wilkinson & Hinkley, Routier & Nichols and Dohany & Hersch, all of Detroit, Mich., for respondents.

TUTTLE, District Judge. These are condemnation proceedings brought by the Secretary of War in the name of the United States, to take by right of eminent domain, certain lands owned by the respondents, for the purpose of improving the Rouge river, a navigable waterway located within this District and in the state of Michigan. The proceedings are based upon and involve the construction and validity of the Act of Congress of May 16, 1906, c. 2465, 34 Statutes at Large, 196 as amended by Act of June 29, 1906, c. 3628, 34 Statutes at Large, 632, being section 9881 of West's United States Compiled Statutes of 1918. This statute provides as follows:

> "Whenever any person, company, or corporation, municipal or private, shall undertake to secure any land or easement therein needed in connection with a work of river and harbor improvement duly authorized by Congress, for the purpose of conveying the same to the United States free of cost, or for the purpose of constructing, maintaining, and operating locks, dry docks, or other works to be conveyed to the United States free of cost, and of constructing, maintaining and operating dams for use in connection therewith, and shall be unable for any reason to obtain the same by purchase and acquire a valid title thereto, the Secretary of War may, in his discretion, cause proceedings to be instituted in the name of the United States for the acquirement by condemnation of said land or easement, and it shall be the duty of the Attorney General of the United States to institute and conduct such proceedings upon the request of the Secretary of War: Provided, that all expenses of said proceedings and any award that may be made thereunder shall be paid by the said person, company, or corporation, to secure which payment the Secretary of War may require the said person, company, or corporation to execute a proper bond in such amount as he may deem necessary before said proceedings are commenced."

By motions to dismiss and by answers various respondents have raised objections to the sufficiency of the petitions for condemnation, as matter of law, and to the legality of the proceedings and the constitutionality of the statute just quoted. The several defenses thus presented, formerly presentable by demurrer, or plea, have been argued in accordance with equity rule 29, and are now before the court for disposition.

The facts, as disclosed by the allegations in the pleadings and by the documents referred to therein, are, in substance and so far as the material circumstances are concerned, as follows: The Rivers and Harbors Act of July 27, 1916, chapter 260, 39 Statutes at Large, 409, directed the War Department to make a preliminary examination of the said Rouge river with a view to the possible improvement thereof.

In accordance with said act, on December 12, 1916, the district engineer officer of the United States army transmitted to the chief of engineers, through the division engineer, a report of the result of such preliminary examination. In this report, after referring to certain improvements previously made by the government in said river, the district officer proceeds with certain statements and recommendations, the substance of which may be gathered from the following quotations therefrom:

"The demand for further improvement of the Rouge river is due primarily to the location of a-large industrial plant by the Ford Motor Company near the head of the present improved portion of the river. The construction of this plant has already been started, and when completed it will occupy a frontage on the Rouge of about 3,000 feet, immediately below Maples Road, and will give employment to about 15,000 people. There will be two blast furnaces requiring for full operation a supply of iron ore at the rate of about 6,000 tons per day during the navigation season, and having an output of about 1,000 tons of metal per day. It is contemplated to provide two more furnaces whenever they become necessary. In addition to the iron ore, which is to be brought in exclusively by water, the Ford Motor Company expects to ship about 50 per cent. of the factory product by water. For the economic handling of iron ore, it is desirable that the channel be sufficient for boats of 600 feet length, 65 feet beam, and 20 feet draft. * * * The Rouge river is used as part of the harbor front of the city of Detroit, and the freight handled by vessels making landings in the Rouge might very properly be grouped with other commercial statistics of water-borne commerce of the city of Detroit. * * * If the Ford Motor Company completes the two projected furnaces and operates them at full capacity, the ore required will amount to about 1,300,000 tons per year. The company has in view an ultimate furnace capacity of twice the initial, and expects to ship out by water about one-half of the output of the factory. Hence it seems that it may reasonably be expected that the Ford Motor Company's plant alone will add at least 1,300,000 tons to the annual freight movement upon the Rouge, and that before many years the in and out bound tonnage from this factory will be much in excess of this figure. The industries already making use of the river may be expected to increase their annual tonnage of water-borne freight. The rapid industrial growth of Detroit will, undoubtedly, not only result in a considerable growth in the business of those now owning docks on the Rouge, but will cause new industries to be established along that stream, provided the facilities for navigation in the Rouge are satisfactory for a heavy freight movement. It is believed that, within a few years after the completion of a channel suitable for the largest lake carriers, the total annual freight movement upon the Rouge will considerably exceed 3,000,000 tons, and that there will be a continual growth thereafter. * * *

"As previously stated, an improvement sufficient for the demands of commerce would practically convert the river into an artificial slip, following the general alignment of the natural river bed. No through commerce upon the Rouge river would result, but the harbor frontage of the city of Detroit would be increased, and the establishment of industries within reach of navigable water would be facilitated, with the resulting tendency toward increasing the total tonnage of freight moved upon the Great Lakes. The construction of the slip would be in the interest of practically all owners of land bordering it, and such owners would be more benefited than would other citizens of Detroit, but the increase in the freight traffic of the city expected to follow the completion of the improvement would be of general benefit. It has not been the practice of the government to assist in the construction of private slips, but it is believed that the conversion of the Rouge river into a slip will be of sufficient general benefit to cause it to be considered differently from other dock improvements. It is understood that in the past it has been considered proper to add to the harbor frontage of important cities at the expense of the general government, as, for example, in the case of the improvement of

Harlem River and of some of the streams passing through important lake cities. My conclusion is that the general and the private benefit are so intermingled that the cost of the improvement ought to be divided between the United States and the locality, and that the proper basis for dividing the cost will be for the United States to undertake the actual work of the improvement and for the local interests to donate the necessary land and to assume the burden of ascertaining and settling claims for damages as well as the cost for making alterations in bridges when these cannot be required to be made at the expense of the owners.

"There is strong reason for believing that the improvement would result in a large increase in the freight movement upon the Rouge river; but until the cost of the improvement is ascertained it is impracticable to do more than make a rough comparison between the benefit to be expected and the cost of the work. * * * I do not believe there is much doubt that the project could not be considered one worthy of being undertaken by the general government, if the entire cost of the work is to be borne by the United States; but with the assumed distribution of costs, as mentioned above, there seems to be sufficient reason for considering the improvement to be worthy to the extent of authorizing the preparation of an estimate of cost."

In transmitting the report of the district engineer just mentioned, the division engineer expressed disagreement with the opinion of the district engineer concerning the division of the cost of improvement of the Rouge river, on the ground that such improvement would be "primarily in the interest of the Ford Motor Company," and he recommended that, therefore, all of such costs should be borne by the "local interests" thus to be benefited. This recommendation, however, as will be hereinafter noted, was not adopted or approved by the superior officers of the division engineer.

Afterwards, on January 10, 1917, the Board of Engineers for Rivers and Harbors recommended to the chief of engineers that a survey be made in connection with the proposed improvement. On February 8, 1917, the district engineer officer who made the preliminary examination and report already referred to, submitted to the chief of engineers, through the division engineer his "Survey Report upon Rouge River, Michigan." This report contains the following language:

"I stated in the preliminary report that this improvement, in my opinion, has both a public and private character; that the general and private benefits are so intermingled that the cost of the improvement ought to be divided between the United States and the locality; and that the proper basis for dividing the cost will be for the United States to excavate and maintain the channel and for the local interests to donate the necessary land and assume the burden of ascertaining and settling claims for incidental damages as well as the cost of making the alterations in bridges when these cannot be required to be made at the expense of the owners. * * * A number of riparian owners who were present at the public hearing held on November 16, 1916, stated that the portions of their lands necessary for the improvement would be donated. Some owners undoubtedly will not donate the land, and it may be necessary for the United States to enter condemnation proceedings to obtain it. However, all costs connected with the condemnation proceedings and with the payment of the awards for the land should be provided for by the local interests. * * *

"It is believed that the presentation in the preliminary report shows that the proposed improvement will add a considerable wharf frontage to the city of Detroit, and that there will result a considerable increase in the commerce of the port. I may add that the improvement seems almost essential for the economical operation of the furnaces to be erected by the Ford Motor Com-

pany. In view of the importance of the improvement in developing the commerce of the city of Detroit, I recommend that the Rouge river be improved by the plan heretofore described and designated as plan A, and that the necessary money be appropriated under the condition that none of it shall be expended for other than survey work until the local interests have given satisfactory guaranties of the assumption of costs by them for rights of way, alterations of bridges and incidental damages. It is further recommended that a proviso be incorporated in the appropriation act that, in the event the right to use the cut-off canal cannot be obtained, at the discretion of the Secretary of War the improvement may be carried on in accordance with plan B."

In transmitting, on February 10, 1917, to the chief of engineers the survey report just mentioned, the division engineer reiterated his former statement that the proposed improvement would be "primarily in the interest of one company." This time however, he added the statement that he concurred in the opinion of the district officer as to the conditions of co-operation. In forwarding the last-mentioned report of the district engineer officer to the chief of engineers, the Board of Engineers for Rivers and Harbors, on February 13, 1917, submitted its own report, in substance as follows:

"The present demand for improvement is due primarily to the location of a large industrial plant by the Ford Motor Company near the head of the present project and just below Maples Road. It is expected that this plant will require about 6,000 tons of iron ore per day during the navigation season. For the economical handling of ore the channel should be of sufficient capacity to accommodate vessels of 600 feet length and 20 feet draft. There are other interests below the Ford property that would be benefited and these would be adequately served by such a channel. * * * Consideration has been given to plans of improvement both by the canal (plan A) and by the lower river (plan B). * * * The commerce of the Rouge river has increased from 234,861 tons in 1906 to 1,651,823 tons in 1915, consisting of 515,535 tons of iron ore, 686,092 tons of sand and gravel, and 450,196 tons of other commodities not enumerated. It is thought that the greater part of this commerce pertains to the lower section of the river. The district officer states that if the Ford Company completes and operates its initial plant as contemplated, 1,300,000 tons of freight annually may be expected to result from this source alone, and that this may be greatly increased in the future.

"The district officer regards this improvement as affording both public and private benefits, and he is of opinion that the proper basis for dividing the cost will be for the United States to excavate and maintain the channel and for local interests to donate the land, assume the cost of bridge alterations and of all damages, direct or indirect, that may result from the improvement on this basis, and recommends plan A, subject to the condition that no funds shall be expended for other than survey work until local interests shall give satisfactory guaranties of their assumption of costs for rights of way, alterations of bridges, and incidental damages, and to the further condition that in the event the right to use the cut-off canal cannot be obtained, the improvement may, in the discretion of the Secretary of War, be carried on in accordance with plan B. The division engineer regards this improvement as primarily in the interests of one company and not worthy of being undertaken by the United States, except as provided by the present project, amplified by deepening the present channel above the Wabash Railroad bridge to 16 feet for a bottom width of 100 feet.

"There is now a commerce of considerable magnitude on the Rouge river, and it is obvious that a much greater tonnage will result if the proposed development at the head of the present improvement is carried into effect. Moreover, it is reasonable to expect that other industries will make increased use of the improved channel. The board does not regard plan B as advisable, as the channel thus afforded would not be suited to large lake freighters and

would be a source of trouble in the future. Plan A is the one that should be adopted, as the cost of the improvement would not be justified for the less suitable waterway. The board is of opinion that it is advisable for the United States to undertake the further improvement of Rouge river, as proposed by the district officer in accordance with plan A, at an estimated cost of $490,000 and $5,000 annually for maintenance, following generally the lines shown on the map but subject to such minor modifications as may be found advantageous in the prosecution of the work, and subject to the conditions of local co-operation proposed by the district officer, and to the further condition that local interests shall provide a suitable turning basin free for public use at the upper end of the improvement."

On February 15, 1917, the chief of engineers sent to the Secretary of War a letter, in which he submitted for transmission to Congress the aforesaid reports, reviewed the various statements and recommendation thereof, and concluded as follows:

"After due consideration of the above-mentioned reports, I concur in the views of the district officer and the Board of Engineers for Rivers and Harbors, and therefore report that the further improvement by the United States of Rouge river, Michigan, is deemed advisable to the extent of providing a channel 200 feet wide and 21 feet deep in accordance with plan A, at an estimated cost of $490,000 for first construction and $5,000 annually for maintenance, following generally the lines shown on the accompanying map, but subject to such minor modifications as may be found advantageous in the prosecution proposed by the district officer, and to the further condition that local interests shall provide a suitable turning basin free for public use at the upper end of the improvement."

On February 15, 1917, the letter just quoted was transmitted to Congress by the Secretary of War, with a letter reading as follows:

"I have the honor to transmit herewith a letter from the chief of engineers, United States Army, of this date, together with copies of reports from Lieut. Col. H. Burgess, Corps of Engineers, dated December 12, 1916, with map, and February 8, 1917, on a preliminary examination and survey, respectively, of Rouge river, Michigan, made by him in compliance with the provisions of the River and Harbor Act, approved July 27, 1916."

On February 16, 1917, the letter last mentioned was referred by Congress to the committee on rivers and harbors and ordered printed, with illustrations. Thereafter said letter and the accompanying letter and reports mentioned therein were printed in a 21 page pamphlet entitled, "House of Representatives, Document No. 2063," with the following caption:

"Letter from the Secretary of War, Transmitting, with a Letter from the Chief of Engineers, Reports on Preliminary Examination and Survey of Rouge River, Michigan."

Thereafter, in the Rivers and Harbors Act approved August 8, 1917 (40 Stat. 250, 258, c. 49) Congress provided, among other things, that—

"The following sums of money * * * are hereby appropriated, out of any money in the treasury not otherwise appropriated, to be immediately available, and to be expended under the direction of the Secretary of War and the supervision of the chief of engineers, for the construction, completion, repair and preservation of the public works hereinafter named: * * * For improvement of Rouge river, Michigan, in accordance with the report submitted in House Document numbered 2063, Sixty-Fourth Congress, second session, and subject to the conditions set forth in said document, $490,000: Pro-

vided, that the Secretary of War may, in his discretion, substitute plan B for plan A."

On May 23, 1919, Newton D. Baker, Secretary of War, made and signed the following finding, a copy of which is attached to each petition herein:

"The Congress of the United States, by an act entitled 'An act making appropriations for the construction, repair and preservation of certain public works on rivers and harbors and for other purposes,' approved August 8, 1917, having made an appropriation for a public work as therein stated, namely, for the improvement of the Rouge river, Michigan, under the direction of the Secretary of War and in accordance with the report submitted in House Document 2063, Sixty-Fourth Congress, Second Session; and it appearing to the satisfaction of the said Secretary of War of the United States that the lands privately owned, among others, in the county of Wayne, Michigan, described in the schedules hereto attached, are located within the lines of said improvement and are necessary for such improvement; and it appearing that the several owners thereof have refused to donate said lands, and that the other local interests mentioned in said House Document, undertaking to secure the necessary lands and rights of way for such improvements, have been unable for good and sufficient reasons to obtain the same by purchase as required for said work, and that said local interests have offered to give suitable bond to the United States of America, for the benefit of whom it may concern, to secure payment of the expense of condemnation proceedings on behalf of the United States of America to acquire title to the rights aforesaid in said lands, and to pay any awards that may be made in such proceedings: Therefore, in consideration of the foregoing, it is hereby found and determined by the undersigned Secretary of War of the United States that it is necessary for the public benefit and for the prosecution, completion, operation, and use of said public improvement in accordance with plan A, described in said House Document No. 2063, that the United States of America acquire and obtain a perpetual right of way over, along and upon each parcel of the lands described in said schedules hereto attached, together with the right to make such improvement, excavate a channel therefor, and to remove, carry away and dispose of so much earth and materials therefrom as may be necessary in such work.

"It is further hereby found and determined that the owners respectively, of said several parcels refuse to donate said lands or rights of way therein, for such improvement, and that the other local interests described in said report, as being required to donate the necessary land for said improvement, have been unable, for good and sufficient reasons, to obtain the same by purchase or the rights therein, as required for the construction, completion and operation of said public work; that the bond tendered by said local interests, under the provisions of the Act of June 29, 1906, being chapter 3628, 34 Statutes at Large, page 632, for the commencement of condemnation proceedings as aforesaid, is sufficient in amount and as to the sureties thereto: Therefore, the undersigned, Secretary of War of the United States, hereby respectfully requests the Attorney General of the United States to institute and conduct the necessary proceedings in the United States District Court for the Eastern District of Michigan, Southern Division, in the name and on behalf of the United States of America, to acquire by condemnation the rights and easements in said lands as above described, needed for said public work."

After referring to the foregoing facts and proceedings, each petition prays that the owners and other persons having interests in the lands thus sought to be taken be made respondents herein; that a jury be summoned and impaneled to ascertain and determine the just compensation to be made respectively to said respondents; that judgment be given in favor of the United States, condemning a perpetual right of way over the said lands for the United States to construct and main-

tain said public work, "and to excavate, remove and dispose of so much earth and other materials within the lines of said improvement as may be necessary for the construction and maintenance thereof"; and—

"that on filing this petition an order may be entered hereon, by this court, providing for the taking of immediate possession of each and all of said lands by petitioner for such improvement and fixing the amount and form of certain and adequate security to be given on behalf of the United States, as petitioner herein, for the payment of such just compensation as may be awarded to the party or parties entitled thereto on account of the taking of the rights of way and otherwise hereinbefore mentioned as required for said improvement, which certain and adequate security, petitioner hereby offers to give as may be, by the court, directed."

Respondents insist that the petitions should be dismissed for the following reasons: That the use for which the taking of the lands is sought is a private and not a public use; that the necessity for taking such lands has not been judicially determined in accordance with the laws of Michigan governing the taking of private property by right of eminent domain; that no provision for the payment of just compensation for such lands has been made; and that it has not been shown that the "local interests" involved have been unable to purchase the lands thus sought to be taken. There are so many phases and aspects of the objections thus broadly stated, and these are so closely interwoven, that it seems advisable to consider them together in discussing, as a whole, the questions involved and the legal rules and principles applicable.

[1] While private property cannot be taken, even under the right of eminent domain, unless necessary for public use, and then only if just compensation be paid therefor, yet it is not necessary, in the absence of express constitutional or statutory requirements to that effect, that such compensation be paid before the actual taking of the property, provided that reasonably certain, prompt, and adequate provision for the payment of just compensation be made, or the public faith and purse be pledged for such payment. Cherokee Nation v. Southern Kansas Railway Co., 135 U. S. 641, 10 Sup. Ct. 965, 34 L. Ed. 295; Sweet v. Rechel, 159 U. S. 380, 16 Sup. Ct. 43, 40 L. Ed. 188; Adirondack Railway Co. v. People, 176 U. S. 335, 20 Sup. Ct. 460, 44 L. Ed. 492; Crozier v. Krupp, 224 U. S. 290, 32 Sup. Ct. 488, 56 L. Ed. 771; Bragg v. Weaver, 251 U. S. 57, 40 Sup. Ct. 63, 64 L. Ed. ——.

[2] It is well settled that the question whether the use for which property is sought to be taken is a public use is a judicial question. Shoemaker v. United States, 147 U. S. 282, 13 Sup. Ct. 361, 37 L. Ed. 170; Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369; Hairston v. Danville & Western Railway Co., 208 U. S. 598, 28 Sup. Ct. 331, 52 L. Ed. 637, 13 Ann. Cas. 1008; Sears v. Akron, 246 U. S. 242, 38 Sup. Ct. 245, 62 L. Ed. 688.

[3] It is also established that the use of property by the United States, when necessary for the purpose of improving the navigability of navigable rivers within its jurisdiction, is a public use for which it is entitled to take such property by the power of eminent domain.

266 F.—8

Kaukauna Water Power Co. v. Green Bay & Mississippi Canal Co., 142 U. S. 254, 12 Sup. Ct. 173, 35 L. Ed. 1004; Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463; Scranton v. Wheeler, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126; United States v. Chandler-Dunbar Water Power Co., 229 U. S. 53, 33 Sup. Ct. 667, 57 L. Ed. 1063. It is not disputed that the use for which this land is sought to be taken is the improvement of the navigability of the Rouge river, which is a navigable stream, or that the result of such use will not be the improvement of such navigability.

[4] The mere fact that the taking of property for a public use will result in greater benefit to some persons than to others, or that private individuals contribute to the expense of such taking, does not affect the character of such use, or render it any the less public, within the meaning and scope of the law of eminent domain. Fallbrook Irrigation District v. Bradley, supra; Hairston v. Danville & Western Railway Co., supra; Union Lime Co. v. Chicago & Northwestern Railway Co., 233 U. S. 211, 34 Sup. Ct. 522, 58 L. Ed. 924.

[5] If the use for which any particular property is sought to be taken is a public use, the question whether such property is necessary for such use is a legislative question, and the determination thereof by the proper legislative body cannot be questioned in condemnation proceedings brought for the taking thereof. Shoemaker v. United States, supra; Monongahela Navigation Co. v. United States, supra; Chappell v. United States, 160 U. S. 499, 16 Sup. Ct. 397, 40 L. Ed. 510; United States v. Gettysburg Electric Railway Co., 160 U. S. 668, 16 Sup. Ct. 427, 40 L. Ed. 576; A. Backus, Jr., & Sons v. Fort St. Union Depot Co., 169 U. S. 557, 18 Sup. Ct. 445, 42 L. Ed. 853; Adirondack Railway Co. v. People, supra; Sears v. Akron, supra; Bragg v. Weaver, supra.

[6] A hearing on the question of necessity is not essential to due process of law in the sense of the Fourteenth Amendment. Bragg v. Weaver, supra.

[7] The power to determine the question of such necessity may be delegated by Congress to executive officials of the Government, and the finding by such officials on this question, made in the exercise of such delegated power, is not subject to review by the courts. Chappell v. United States, supra; Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523; Bragg v. Weaver, supra.

[8] Applying these principles to the present case, the proposed use is a public use, and Congress has, by the Rivers and Harbors Appropriation Act already mentioned, authorized the improvement of the navigability of this stream, "in accordance with the report submitted in House Document No. 2063," hereinbefore reviewed, "and subject to the conditions set forth in said document." One of these conditions was the assumption, by the local interests concerned, of "all costs connected with the improvement other than those for excavation and maintenance of channel" (Id. p. 18), including the donation of the "necessary land" (Id. p. 19), and the payment of any "incidental damage" (Id. p. 20).

It appears that the properly authorized officer of the government, the Secretary of War, has found, as a fact, that it is necessary to take, for the public use mentioned, the lands involved in these proceedings. If, therefore, the "local interests" referred to are "unable," within the meaning of the statute involved, to purchase the land thus needed, for the purpose of conveying it to the United States, as thus required, it seems clear that the present situation is exactly what was contemplated by Congress in enacting the statute in question.

Bearing in mind the presumption of constitutionality attending this statute, and in view of its evident meaning and purpose, I am satisfied that it does not delegate to private parties the right of eminent domain. It merely provides that when, as here, the government desires to take private land necessary for a public use mentioned in the statute, but wishes to have such land donated by private interests, willing, but unable, to do so, because unable to purchase and acquire a valid title thereto, in that event the United States government, instead of receiving the land itself from such person, company, or corporation, as it would have the right to do (Act April 24, 1888, c. 194, 25 Statutes at Large 94 [section 9878, West's U. S. Compiled Statutes of 1918]), may, under the circumstances mentioned, accept, from the private interests concerned, reimbursement of the expense of acquiring such land by condemnation; that is, payment of the just compensation which must be made therefor, when, and as, duly determined in condemnation proceedings properly brought in the name of, and by, the government against the owners of the land so needed. The government, not the private interest, condemns and takes the land. The only connection with the matter which such private interest has is its arrangement with the government to save the latter harmless from the cost of such taking.

[9] The mere commencement of these condemnation proceedings is not, of course, the taking of any property, and the actual payment of compensation, therefore, need not precede or accompany the filing of the petitions herein (Cherokee Nation v. Southern Kansas R. R. Co., supra; Bauman v. Ross, 167 U. S. 548, 17 Sup. Ct. 966, 42 L. Ed. 270), although by instituting such proceedings the government has pledged its faith, and has absolutely obligated itself, to make just compensation at the proper time; that is, upon the actual taking of the property sought, in the same manner, and to the same extent, as if it were proceeding without reference to the statute in question.

Moreover, by the Act of July 18, 1918, c. 155, § 5, 40 Statutes at Large, 911 (section 9878a West's 1919 Supplement to U. S. Compiled Statutes), Congress has provided as follows:

"Whenever the Secretary of War, in pursuance of authority conferred on him by law, causes proceedings to be instituted in the name of the United States for the acquirement by condemnation of any lands, easements, or rights of way needed for a work of river and harbor improvement duly authorized by Congress, the United States, upon the filing of the petition in any such proceedings, shall have the right to take immediate possession of said lands, easements, or rights of way, to the extent of the interest to be acquired, and proceed with such public works thereon as have been authorized by Congress:

Provided, that certain and adequate provision shall have been made for the payment of just compensation to the party or parties entitled thereto, either by previous appropriation by the United States or by the deposit of moneys or other form of security in such amount and form as shall be approved by the court in which such proceedings shall be instituted. The respondent or respondents may move at any time in the court to increase or change the amounts or securities, and the court shall make such order as shall be just in the premises and as shall adequately protect the respondents. In every case the proceedings in condemnation shall be diligently prosecuted on the part of the United States in order that such compensation may be promptly ascertained and paid."

Pursuant to this statute, petitioner prays in its petition that—

"On filing this petition, an order may be entered therein, by this court, providing for the taking of immediate possession of each and all of said lands by petitioner, for such improvement, and fixing the amount and form of certain and adequate security to be given on behalf of the United States, as petitioner herein, for the payment of such just compensation as may be awarded to the party or parties entitled thereto on account of the taking of the rights of way and otherwise hereinbefore mentioned as required for said improvement, which certain and adequate security, petitioner hereby offers to give as may be, by the court, directed."

I find no variance or inconsistency between the promise (not only implied from its action in commencing those proceedings, but also expressly made in its petitions therein) by the government to make the necessary compensation for this land, and the conditional form of the resolution of Congress authorizing the work for which such land is sought. On the one hand, as between the owners of the land and the government, the latter is exercising its right, under the power of eminent domain, to take certain land necessary for a public use, and is offering to pay just compensation therefor when taken, which is all that said owners are entitled to demand, having no right to inquire as to the manner in which, or the source from which, the government may obtain the means of making such compensation. On the other hand, as between the "local interests" and the government, the latter has the right to require, as a condition precedent to the exercise of its power of eminent domain, an undertaking and guaranty that the former will pay any awards made in these condemnation proceedings for the land so taken. While the government has refused, except as against the owners of this land, to bear the expense of taking such land, and has announced that any such expense must be borne by the local interests concerned, it has not refused to take said land if it be donated for the purpose of carrying out the improvement desired, or if, what amounts to essentially the same thing, the cost of obtaining said land be donated; nor has it refused to pay, or cause to be paid, to the owners thereof, the just compensation to which they are entitled if their land be so taken. The only difference, in regard to the payment of compensation, between this case and any other case of condemnation, is that here the government is fortunate enough to have a private source from which to obtain the money to be paid as just compensation for this land, while ordinarily it would have been compelled to draw such money from the public treasury, without any reimbursement therefor.

But this is a matter which neither affects nor concerns the owners of such land, who receive their just compensation for land needed by the government for a public use, and who, therefore, cannot complain that they have been, or will be, deprived of any legal rights.

It must be inferred that, in authorizing this public improvement on the terms and conditions specified, Congress contemplated the possible necessity of resorting to the condemnation machinery provided by this statute, in order to obtain this land. Indeed, this is made clear by the fact that the report which set forth the conditions adopted by Congress in authorizing such improvement contains the following language:

"Some owners undoubtedly will not donate the land, and it may be necessary for the United States to enter condemnation proceedings to obtain it. However, all costs connected with the condemnation proceedings and with the payment of the awards for the land should be provided for by the local interests."

I am satisfied that the United States government is not attempting to take any of this land without payment of just compensation therefor, but is merely availing itself of the benefit afforded by the statute in question, by insisting that the expense of making such compensation shall be borne by the "local interests" mentioned.

[10, 11] The objection that this property cannot be taken in these proceedings, because the necessity of such taking is not to be determined by a jury in accordance with the constitutional and statutory provisions of the state of Michigan governing such proceedings is without merit. As has been already pointed out, the question as to the necessity for the taking of private property by the United States for a public use is a legislative question, and the decision of Congress or of the executive official to whom the making of such decision has been delegated by Congress is final, and cannot be questioned in this proceeding. It is true that the Act of Congress of April 24, 1888, c. 194, 25 Statutes at Large 94 (section 9878, West's U. S. Compiled Statutes of 1918), provides that—

"The Secretary of War may cause proceedings to be instituted, in the name of the United States, in any court having jurisdiction of such proceedings, for the acquirement by condemnation of any land, right of way, or material needed to enable him to maintain, operate or prosecute works for the improvement of rivers and harbors for which provision has been made by law; such proceedings to be prosecuted in accordance with the laws relating to suits for the condemnation of property of the states wherein the proceedings may be instituted."

This statute, however, subjects such proceedings to the state laws only in respect to matters of procedure and not to matters of substance. Kanakanui v. United States, 244 Fed. 923, 157 C. C. A. 273. The right to determine the necessity of the taking of property for public use, under the power of eminent domain, is necessarily incident to the sovereign power of the United States government to determine for itself whether it needs any particular property for such use. This right and power cannot be limited or affected by the laws of a state

unless Congress so provides, and no federal legislation to that effect has been enacted.

[12] One further question remains to be considered. It is urged by respondents that the question whether the local interests involved have been unable to purchase and obtain a valid title to the lands sought is a judicial question, which must be determined in this proceeding, while petitioner contends that the decision of that question rests with the Secretary of War as a preliminary phase of the discretionary power, with which he is vested, to cause these proceedings to be instituted in the name of the United States. While the question thus raised is not free from doubt, after careful consideration thereof, I have reached the conclusion that the contention of respondents cannot be sustained. The argument that the fact of inability to purchase is a jurisdictional condition, which, like other facts on which the jurisdiction of the court depends, is one of the issues in the case and must be determined herein, seems on first impression to have force. Further reflection, however, appears to reveal the unsoundness of the argument.

The duties and powers of the Secretary of War in connection with proceedings of this kind are confined to determining whether particular lands are needed in connection with any certain work of river and harbor improvement duly authorized by Congress, and, if such lands be so needed, to deciding whether condemnation proceedings are to be instituted in the name of the United States for the acquirement of such lands. In determining whether he will cause such proceedings to be instituted, the Secretary of War, acting within the exercise of "his discretion," must necessarily decide some questions, at least to his own satisfaction. When he has requested the Attorney General to institute and conduct such proceedings, it becomes the duty of the latter officer to comply with such request, and when the proceedings have been commenced questions arising thereafter, such as those concerning the nature of the use for which the land is sought, the amount of compensation to be made to the owners of such lands, the practice to be followed, and kindred questions, are to be determined in the condemnation proceedings. With none of these last-mentioned questions has the Secretary of War any official concern or connection. The duties imposed, and the powers conferred, upon him are ultimately to decide whether he will cause condemnation proceedings to be instituted. In making this decision, he must first determine the necessity for the taking. His determination as to the necessity of such taking is final, and not reviewable by the courts. I cannot avoid the conclusion that the question whether the local interests have been unable to acquire the lands involved, as well as the necessity for using such lands, really enters into and becomes a part of the broad question of the necessity for instituting condemnation proceedings, which the Secretary of War, not the court, must decide. It is a familiar rule that a statute which, either expressly or by necessary implication, gives a discretionary power to any public official, to be exercised by him upon his opinion concerning certain facts, constitutes him the sole and exclusive judge of the existence of such facts. Martin v.

Mott, 12 Wheat. 19, 6 L. Ed. 537; Kennedy v. Gibson, 8 Wall. 498, 19 L. Ed. 476; Mullan v. United States, 140 U. S. 240, 11 Sup. Ct. 788, 35 L. Ed. 489.

The present case is not to be confused with one in which a quasi public corporation or agency is seeking to exercise the qualified power of eminent domain conferred upon it by a state or by the national government. In such a case, the condemning party possesses only the power expressly bestowed upon it, and must, before it is entitled to exercise such power, prove, as a material issue, any facts on the existence or performance of which its power of eminent domain depends. One of the most common of such requirements is the duty imposed upon the condemning party to attempt the purchase of the land desired before proceeding to take it, and when such an attempt is made a condition to the power of condemnation, of course the performance of such condition is a jurisdictional fact, and must appear as a basis for the right to take under such qualified power of eminent domain. Here, however, no such situation is presented. The private party whose inability to purchase is mentioned in the statute has no power to institute or maintain condemnation proceedings. Such inability is not made a condition to any suggested right of such party to take property by power of eminent domain. It is the United States government which is given the authority to condemn or to bring the proceedings under this statute. Now, the power of eminent domain possessed, and thus sought to be exercised, by the United States, is a power which inherently belongs to it as a sovereign nation. It is of the broadest character and scope, and not limited by any conditions requiring negotiation, unless Congress has so provided. We are not dealing with a condition which exists, if not removed, but with a condition which does not exist, unless created by this statute. In the former case, indefinite language would not remove; in the latter case, indefinite language does not create. In other words, when, as here, the United States is the condemning party, its power to take property is not qualified by a condition precedent, such as the duty to first exhaust its efforts to purchase such property unless such condition be affirmatively shown to have been expressly imposed upon its right to exercise that power. I do not discover any language in this statute to indicate an intent on the part of Congress to create such a jurisdictional condition for the determination of the court.

The Secretary of War is the representative of the government, whose duty it is to determine whether such proceedings are to be instituted. The inability of the local interests to obtain by purchase the land sought to be donated to the Government is one of the facts to be considered by the Secretary of War in determining whether he will, as Congress has provided that he may, "in his discretion," cause such proceedings to be instituted in the name of the United States for the acquirement of such land. I am of the opinion that this is a fact the existence of which must of necessity be decided by the Secretary of War in accordance with his own judgment. It results that all of the legal objections raised as to the sufficiency of the petitions

herein, and as to the constitutionality of the statute involved, must be overruled, and the motions denied.

The most comprehensive and closely applicable Michigan statute relating to the practice in such a case appears to be Act 149 of the Michigan Public Acts of 1911 (section 353 et seq., Michigan Compiled Laws of 1915), and that statute should govern the procedure in these proceedings, in so far as it is not inconsistent with the views here expressed. An order will be entered, overruling all objections urged, and denying the motions made by respondents.