## ALABAMA POWER CO. v. GULF POWER CO. et al.

(District Court, M. D. Alabama, at Montgomery. March 15, 1922.)

1. **Eminent domain ⊕178½—Pendency of condemnation proceeding in state court held not to abate similar proceeding in federal court.**

The pendency in a probate court of a proceeding to condemn lands of riparian owners did not abate proceeding in the United States District Court to condemn such lands under Federal Water Power Act, § 21, where the state court had not acted in the proceedings, and had done nothing to assert dominion or control over the lands involved; the courts having concurrent jurisdiction.

2. **Abatement and revival ⊕12—Pendency of action in personam in state court will not abate similar action in federal court.**

The pendency of an action in personam in a state court will not abate a subsequent similar proceeding in a federal court, where both courts have concurrent jurisdiction.

3. **Eminent domain ⊕166—Proceeding to condemn land under Federal Water Power Act is not a proceeding in rem.**

A proceeding to condemn lands of riparian owners under Federal Water Power Act, § 21, is not, strictly speaking, a proceeding in rem, since the court itself never assumes possession of or dominion over the land sought to be condemned.

4. **Constitutional law ⊕48—Statute presumed constitutional.**

The presumption is that a statute is constitutional.

5. **Eminent domain ⊕24—Use of land for improvement of navigation a "public use."**

The use of property for improvement of navigation is a public use, and the property may be taken by condemnation under the power of eminent domain of the United States, provided just compensation shall be afforded the owner.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Public Use.]

6. **Eminent domain ⊕5—May sequester land for a federal purpose without consent of state.**

The United States may sequester land for a federal purpose without the consent of the state.

7. **Constitutional law ⊕281—Hearing on question of necessity of taking property for public purpose declared necessary by Legislature not required by due process clause of Constitution.**

Where the necessity of taking property for a public use has been determined by the Legislature, a hearing on the question of necessity is not essential to due process of law demanded by Const. Amend. 14.

8. **Eminent domain ⊕67—Legislative declaration as to the use of property being a public use respected by courts.**

Where the Legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use is palpably without reasonable foundation.

9. **Eminent domain ⊕67—Necessity of particular property for public use may be a question for the courts.**

While the Legislature has the authority to declare when a necessity exists for the exercise of the power of eminent domain, the use of any particular property for such public purpose may be a question for the courts.

10. **Eminent domain ⊕5—United States cannot condemn property, unless necessary for use of United States.**

The United States cannot take property by condemnation, unless necessary for the use of the United States.

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

11. **Eminent domain** ⊙═14—That some persons will benefit more than others, or that private individuals contributed to expense of undertaking, does not destroy public nature of use.

Where property is taken for a public use, the fact that it will result in greater benefit to some persons than to others, or that private individuals contributed to the expense of such undertaking, does not affect the constitutional character of such use, or render it any less of a public nature, within the scope and meaning of the law of eminent domain.

12. **Eminent domain** ⊙═11—Power of eminent domain not delegated to persons who contribute to expenses of proceeding or pay compensation award.

The fact that the expenses incident to the condemnation and the compensation award are paid by a private person or corporation is not a delegation of the power of eminent domain to private parties, since the property is acquired by the government, and it is immaterial what arrangement the government may have with others for the payment of the compensation.

13. **Eminent domain** ⊙═47(1)—Rights of state in navigable waters subordinate to right of United States to condemn lands for improvement of navigation.

The absolute property in and dominion over navigable streams, tidewaters, and the underlying soils is in the states; but such rights are subordinate to the power of eminent domain of the United States to condemn lands for improvement of navigation, under the power of Congress to regulate foreign and interstate commerce.

14. **Navigable waters** ⊙═22(1)—Congress not authorized to dam up navigable streams for sole purpose of generating hydro-electricity.

Congress is not empowered to dam up navigable streams for the sole purpose of generating hydro-electricity for the sale thereof.

15. **Navigable waters** ⊙═3—Federal Water Power Act held not unconstitutional, as against contention that it trespasses on rights of state in navigable waters.

Federal Water Power Act, creating the Federal Power Commission, with authority to regulate dams and reservoirs on navigable streams and to grant to licensees authority to construct dams on navigable streams, with the right to the surplus water at the weir not necessary for navigation as compensation for outlay in construction of dam, *held* not unconstitutional, as against the contention that it trespasses on the power of the state to control and regulate or use their navigable waters, since the rights of the state in such waters are subordinate to the federal government's right to promote navigation; the principal purpose of the statute being the promotion of navigation, in view of sections 3, 4, 6, 7, 10, 11, 12, 19, 21, and 27, providing that nothing contained in the act should be construed to affect or interfere with the laws of the respective states "relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein," the words "other uses" being construed ejusdem generis with the words "irrigation" and "municipal."

16. **Constitutional law** ⊙═62—Federal Water Power Act held not unconstitutional, as delegation to commission of legislative powers.

Federal Water Power Act, creating the Federal Power Commission, with authority to regulate dams and reservoirs on navigable streams, and to grant to licensees authority to construct dams on navigable streams, with the right to the surplus water at the weir not necessary for navigation as compensation for outlay in construction of dam, *held* not unconstitutional, as against the contention that it constitutes a delegation of legislative functions to the power commission rather than the bestowal of administrative duties.

17. **Evidence** ⊙═10(5)—Judicial notice taken of navigable character of stream.

The court takes judicial notice of the fact that the Coosa river is a navigable stream, and navigable in fact at least in part in Georgia and Alabama, although it may not be known as a matter of common informa-

⊙═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tion at what particular place between its mouth and its source its navigability ceases.

18. **Navigable waters** ⬡⟞ⅼ (3)—**Capability of use by public for purposes of transportation and commerce the criterion of navigability.**

The capability of use by the public for purposes of transportation and commerce is the true criterion of the navigability of a river, rather than the extent and manner of its use.

19. **Constitutional law** ⬡⟞62—**Congress can delegate right of eminent domain to a federal agency.**

Congress can delegate the right of eminent domain to a federal agency selected pursuant to congressional authority, an agency for carrying out its policy and principles in an administrative way in the development or improvement of navigation.

20. **Statutes** ⬡⟞194—**Rule of "ejusdem generis" stated.**

The rule of "ejusdem generis" is that when, in a statute, general words follow a designation of particular subjects or classes, the meaning of the general words will ordinarily be presumed to be restricted by the particular designation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Ejusdem Generis.]

Proceeding by the Alabama Power Company against the Gulf Power Company and others to condemn lands of riparian owners under Federal Water Power Act, § 21. On plea in abatement on the ground of the pendency of a prior suit for similar purpose in the probate court of Coosa county, Ala., and plea challenging the constitutionality of such act. Both pleas overruled.

This is a proceeding for the condemnation of the lands of riparian owners under section 21 of the Federal Water Power Act, approved June 10, 1920 (41 Stat. 1063, 1074). Plea in abatement on the ground of the pendency of a prior suit for similar purpose in the probate court of Coosa county, Ala., and plea challenging the constitutionality of the Federal Water Power Act. Each overruled.

Wm. L. Martin and Borden Burr, both of Birmingham, Ala., S. H. Dent and Jones & Thomas, all of Montgomery, Ala., O. L. Hood, of Gadsden, Ala., and Graham Sumner, of New York City, for petitioners.

Coleman, Coleman & Spain, of Birmingham, Ala., Marion Rushton, of Montgomery, Ala., and H. L. Butler, of Madison, Wis., for different respondents.

CLAYTON, District Judge. The multitudinous, redundant, and prolix pleadings, varying in verbiage, are reduced to the propositions herein considered. They are rescued from attempted complexity and confusion. With due deference to learned counsel, it must be said that, unlike the concept of time or space, none of the legal principles involved is susceptible of infinite divisibility.

[1] As to the plea in abatement because of the pendency of a prior petition for a similar purpose in the probate court of Coosa county, Ala., it is perhaps sufficient to say that the rule seems to be practically uniform that the mere pendency of a suit in the state court will not abate a subsequent proceeding in a federal court, where both courts

⬡⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

have concurrent jurisdiction, since each court derives its authority from separate and distinct sovereignty. Especially is the rule applicable in this case, for here it is admitted that the state court has not acted in the proceedings begun there, although they were instituted some months ago. The state court has never done anything to assert dominion or control in any way over the lands, the thing involved in this case. In refutation of the objection that this court cannot now proceed because of the action pending in the state court may be cited Wilson v. Milliken, 103 Ky. 165, 44 S. W. 660, 42 L. R. A. 449, 82 Am. St. Rep. 578, and the comments thereto made by the annotator. He states that, while there is some conflict, the decided weight of authority seems to be that the mere pendency of a suit is not a defence to an action in another court between the same parties, where one is in the federal and the other is in the state court in the same state, having concurrent jurisdiction. A number of federal authorities are cited.

[2, 3] The rule is well settled in so far as actions in personam are concerned. While a proceeding by way of condemnation is often spoken of as a proceeding in rem, in truth it is not, strictly speaking, such a proceeding, since the court itself never assumes possession of or dominion over the property, the land, at any stage. This is illustrated by the Act of Congress of July 2, 1917, amending the condemnation laws of the United States. 40 Stat. 241, c. 35 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6911a). It was discovered during the war that the United States could not get possession of land necessary for camp sites for its soldiers until at the end of the condemnation proceedings. Congress therefore amended the law, so as to authorize the government to take possession immediately upon the institution of the proceedings. This act, however, was limited to the period of the war.

The respondents challenge the constitutionality of the Act of June 10, 1920, under which these proceedings are brought. Its purpose and scope is fairly stated, though in general terms, in the title:

"An act to create a federal power commission; to provide for the improvement of navigation; the development of water power; the use of the public lands in relation thereto, and to repeal section 18 of the River and Harbor Appropriation Act, approved August 8, 1917, and for other purposes."

This act is the fruit of two independent bills introduced in the Congress more than five years ago. One of them, called the Navigable Water Bill, was designed for the construction of dams and reservoirs in navigable waters, for the double purpose of improving navigation and the harnessing of the surplus water in rocky and shoaly courses, where it was deemed best by Congress under the plan to improve the navigability by the slack-water method; the other, called the Public Land Bill, had for its main purposes the devotion of flowing streams to power uses and for the impounding of water on the government domain or reservation for irrigation in furtherance of farm development.

The two bills had one element in common—the development of power. The first sought to confer jurisdiction or administration upon the Secretary of War; the other conferred like power on the Secretary of Interior and the Secretary of Agriculture. These measures never became laws because the Senate and the House of Representa-

283 F.—39

tives could not agree upon the forms and all the provisions. Finally the two pieces of proposed legislation were in material respects combined into the one now called the Federal Water Power Act, before mentioned. This act, among other things, created the Federal Power Commission, consisting of the Secretaries of War, Interior, and Agriculture, and conferred upon this commission the power of authorizing and regulating dams and reservoirs on navigable streams and the like improvements on public lands. It is apparent, of course, that these two subjects of legislation differ from each other, for the first relates to navigable streams and depends upon the power of Congress to regulate interstate and foreign commerce, and the other having reference to public lands belonging to the government, and predicated upon the power of Congress to dispose of the public lands and to make adequate rules and regulations with respect thereto.

Both of these powers, in their respective scopes, have been recognized as plenary. They are, of course, limited as the exercise of legislative power in the first case to navigable waters and in the other to public lands. Under the act here the licensees of the commission are authorized to construct dams on navigable streams according to the congressional policy and plan. The combination of these two subjects into one act necessarily required that latitude should be given to the power commission in passing upon application to erect dams and in determining whether in any case the application should be granted, and upon what conditions, subject to what limitations, and the like, where the public welfare is concerned. It is manifest from specific provisions of the act that it is the duty of the commission to safeguard the interests of the United States in navigation and commerce, as well as the interests of the United States in the public lands. There are provisions designed to restrict the action of the power commission, some relating to commerce and others to public lands. For present purposes it is not necessary to amplify this statement. The features of the act which relate to water power on the public or government lands will not be particularly dealt with at this time, but the important provisions having to do with navigable streams specially in the states will more closely be considered.

The petitioner here is a licensee of the power commission, and as such seeks to condemn the lands of riparian owners, the respondents, on the Coosa river in Alabama. The act is assailed on the grounds that it trespasses upon the power of the state to control and regulate or use their own navigable waters, which powers so claimed on behalf of the state are deemed to be subordinate to the commerce power of Congress to intervene for the protection and improvement of navigation. Gilman v. Phila., 3 Wall. 713, 725, 18 L. Ed. 96; Mobile County v. Kimball, 102 U. S. 699, 26 L. Ed. 238; Wisconsin v. Duluth, 96 U. S. 379, 24 L. Ed. 668. Further, that it is a delegation of legislative functions to the power commission rather than the bestowal of administrative duties. Stated otherwise, it was said to be an attempt on the part of Congress to invade the right of the state, and to take away from the state the control and regulation of hydro-electric development; that it infringes upon the authority of the state in the matter of the transmis-

sion and distribution within the state of electric energy generated therein; and, further, that the effect of legislation is to put the government of the United States into the business, not only of generating, but of transmitting and distributing, intrastate and interstate, power originating at the dams constructed under the government license, which generation, transmission, and distribution it alleged to be aside from or beyond any governmental purpose, but is for the benefit of private corporations or persons licensed to construct the dams on navigable streams.

[4-12] The cardinal rules governing the construction of statutes, attacked upon the ground that they are repugnant to the Constitution of the United States, will be found in the marginal note below.[1]

---

[1] In considering its validity the presumption is that the statute is constitutional. U. S. v. Gettysburg E. Ry., 160 U. S. 680, 16 Sup. Ct. 427, 40 L. Ed. 576; Sweet v. Rechel, 159 U. S. 380, 16 Sup. Ct. 43, 40 L. Ed. 188; Nicol v. Ames, 173 U. S. 509, 19 Sup. Ct. 522, 43 L. Ed. 786. And the rule following this presumption which has always been adhered to, was stated by Chief Justice Marshall to be: "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional." McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579. The use of property, including lands, of course, when necessary for the purpose of improving the navigation on navigable streams, is such public use that authorizes the property to be taken by condemnation under the power of eminent domain of the United States, and the right to exercise this power is limited only by the requirement of the Constitution that just compensation shall be afforded the owner. Kaukauna W. P. Co. v. Green Bay, etc., Canal, 142 U. S. 254, 12 Sup. Ct. 173, 35 L. Ed. 1004; Monongahela N. Co. v. U. S., 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463; U. S. v. Chandler-Dunbar W. P. Co., 229 U. S. 53, 33 Sup. Ct. 667, 57 L. Ed. 1063. And the United States may sequester land for a federal purpose without the consent of the state. Kohl v. U. S., 91 U. S. 367, 23 L. Ed. 449. For eminent domain is the inherent power of the United States as a sovereign to take or to authorize the taking of property within its jurisdiction for the Federal public use. The rule is usually stated to be that where property is sought to be taken or condemned for a public use whether such property is necessary to that end is a legislative question and the determination thereof by the authorized legislative body cannot be questioned in a proceeding to take or condemn the property. Shoemaker v. U. S., 147 U. S. 282, 13 Sup. Ct. 361, 37 L. Ed. 170; Monongahela Nav. Co. v. U. S., 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463; U. S. v. Gettysburg E. Ry. Co., 160 U. S. 668, 16 Sup. Ct. 427, 40 L. Ed. 576. And a hearing on the question of necessity is not essential to due process of law demanded by the Fourteenth Amendment. Bragg v. Weaver, 251 U. S. 57, 40 Sup. Ct. 62, 64 L. Ed. 135. The general rule is modified to the extent that, when the Legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use be palpably without reasonable foundation. Justice Peckham, in U. S. v. Gettysburg, etc., Co., 160 U. S. 680, 16 Sup. Ct. 427, 40 L. Ed. 576. But while the Legislature has the authority to declare when a necessity exists for the exercise of the power of eminent domain yet the use of any particular property for such public purpose may in the end be a question for the courts. Henderson v. City of Lexington (Ky.) 111 S. W. 318, 22 L. R. A. (N. S.) 1; Shoemaker v. U. S., 147 U. S. 282, 13 Sup. Ct. 361, 37 L. Ed. 170; Fallbrook I. Dist. v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369; Hairston v. D. & W. Ry. Co., 208 U. S. 598, 28 Sup. Ct. 331, 52 L. Ed. 637, 13 Ann. Cas. 1008; Sears v. Akron, 246 U. S. 242, 38 Sup. Ct. 245, 62 L. Ed. 688. And the United States cannot take property unless necessary for the use of the United States. Stockton v. Baltimore, etc.,

[13] In the argument much stress was given to the assertion that this act transcends the Constitution and trespasses upon the rights reserved to the states. Of course, at the time the states formed themselves into a more perfect union under the Constitution, they held the right to their own navigable waters and the beds under them, with the power to use or dispose thereof without substantial impairment of the interest of the public in such waters, and the absolute property in and dominion over navigable streams, tidewaters, and the underlying soils were not granted to the general government, but were reserved and now remain in the states or under state sovereignty. Martin v. Waddell, 16 Pet. 367, 10 L. Ed. 997; Manchester v. Mass., 139 U. S. 240, 11 Sup. Ct. 559, 35 L. Ed. 159. Nevertheless, whatever rights the state has to use or dispose of navigable waters, for instance, to bridge, obstruct, divert, or improve, and the like, it is not superior to the power of Congress to regulate foreign and interstate commerce, including navigation and the protection and improvement of the navigability of navigable streams and other waters. Gibbons v. Ogden, 9 Wheat. 1, 194, 6 L. Ed. 23; Stone v. Sou. Ill. Bridge Co., 206 U. S. 267, 27 Sup. Ct. 615, 51 L. Ed. 1057. It is also a settled doctrine that the power of Congress over navigable streams is limited to the protection and improvement of them in the interests of commerce—navigation. However, the municipal power of the states over their streams and the underlying and adjacent lands is subordinate to the power of eminent domain of the United States to take such lands for federal constitutional purposes. Admittedly the federal government can take property necessary for the improvement of the navigability of navigable streams, and when it does take property for such purpose—primary or dominant—then what use or disposition the federal government can rightfully—that is, in harmony with the constitutional grant—make of the surplus water wasted at the dam constructed by the government, or by its authorized agency to improve navigation in a navigable stream

R. R. Co. (C. C.) 32 Fed. 9. Furthermore, where the property is taken for a public use, the fact that it will result in greater benefit to some persons than to others, or that private individuals contributed to the expense of such undertaking, does not affect the constitutional character of such use, or render it any less of a public nature, within the scope and meaning of the law of eminent domain. Fallbrook I. Dist. v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369; Union Lime Co. v. C. & N. W. Ry. Co. 233 U. S. 211, 34 Sup. Ct. 522, 58 L. Ed. 924. The power to determine the question of necessity for public use may be delegated by Congress to executive officials, and their findings on this question in the exercise of such delegated power is not subject to review by the courts (Chappell v. U. S., 160 U. S. 499, 16 Sup. Ct. 397, 40 L. Ed. 510; Union Bridge Co. v. U. S., 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523; Forbes v. U. S. (C. C. A.) 268 Fed. 273; U. S. v. Forbes (D. C.) 259 Fed. 585), except as stated in U. S. v. Gettysburg, etc., Co., 160 U. S. 680. The fact that the expenses incident to the condemnation and the resultant compensation award are paid by private person or corporation is consistent with the Constitution, is not a delegation of the power of eminent domain to private parties, the property being thus acquired by the Government and it being immaterial and of no concern to the owners what arrangement the government may have with others for the payment of the compensation. In Re Condemnation, etc., of Rouge River (D. C.) 266 Fed. 105, 115.

by the slack-water method, is the question presented, and that I shall undertake to answer.

[14-16] This act, providing for navigation and the incidental or servient use of the excessive water which would be wasted at the weir, does not exceed the power granted to Congress. It might be that, if Congress had adopted a plan for the sole purpose of damming up navigable streams in order to generate and sell water power, such an act would be in excess of the Constitution. The far-reaching effect of such federal policy would be a departure from that manifested by the act now under consideration. This enactment is for the improvement of the navigability of the stream. This is the paramount object. But an act which could be reduced to the isolated proposition that the federal government can dam up streams for the sole purpose of generating hydro-electricity and sell the same might be obnoxious to the organic law. I think it would be palpably in excess of the powers granted to Congress by the Constitution. U. S. v. Gettysburg, supra; Henderson v. City of Lexington, 132 Ky. 390, 111 S. W. 318, 22 L. R. A. (N. S.) 20; Shoemaker v. U. S., 147 U. S. 282, 13 Sup. Ct. 361, 37 L. Ed. 170; Fallbrook I. Dist. v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369; Hairston v. D. & W. Ry. Co., 208 U. S. 598, 28 Sup. Ct. 331, 52 L. Ed. 637, 13 Ann. Cas. 1008; Sears v. Akron, 246 U. S. 242, 38 Sup. Ct. 245, 62 L. Ed. 688.

However, that is not the case here. Ever since Gibbons v. Ogden, supra, it has been uniformly held that the power of Congress under the commerce clause comprehends navigation within the limits of every state, so far as navigation improvement is in any manner connected with commerce, whether interstate or foreign. The control of power is a mere incident to that of navigation. In this connection attention is directed to Addyston Pipe Co. v. U. S., 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, where it was held that the power of Congress to regulate foreign and interstate commerce includes the power to legislate upon private contracts in respect to such commerce. Certainly, if Congress can legislate on the subject of private contracts as an incident to its power to regulate commerce, it has authority to legislate upon the incidental subject of hydro-electric energy resulting from surplus water at a dam built for navigation purposes.

[17, 18] The court takes judicial notice of the fact that the Coosa river is a navigable stream, and navigable in fact at least in part in Georgia and Alabama, although it may not be known as a matter of common information at what particular place between its mouth and its source its navigability ceases. U. S. v. Rio Grande etc. Co., 174 U. S. 690, 19 Sup. Ct. 770, 43 L. Ed. 1136. The capability of use by the public for purposes of transportation and commerce is the true criterion of the navigability of a river, rather than the extent and manner of its use. U. S. v. The Montello, 20 Wall. 430, 22 L. Ed. 391.

Now, let the doctrines and principles heretofore referred to in this opinion and in the marginal note be applied to the Federal Power Commission Act. Section 3 defines the term "navigable waters," for it says:

" 'Navigable waters' mean those parts of streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several states, and which either in their natural or improved condition, notwithstanding interruptions between the navigable parts of such streams or waters by falls, shallows, or rapids compelling land carriage, are used or suitable for use for the transportation of persons or property in interstate or foreign commerce, including therein all such interrupting falls, shallows, or rapids, together with such other parts of streams as shall have been authorized by Congress for improvement by the United States, or shall have been recommended to Congress for such improvement after investigation under its authority."

This expression is in harmony with what the Supreme Court has often held the term "navigable stream" to mean, and doubtless it will be admitted that this definition shows that Congress meant to exercise and was exercising its incontestable power over navigable waters of navigable streams. Farther on the act says:

" 'Project' means complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures, including navigation structures, which are a part of said unit"

—showing again that Congress was dealing with navigation or what pertains to it in a detail aspect.

By Section 4 the commission is empowered:

"To make investigations and to collect and record data concerning the utilization of the water resources of any region to be developed, the water power industry and its relation to other industries and to interstate or foreign commerce."

And this evidences an additional intention of Congress to make better use of the water for commerce, as well as to develop power, and that in the promotion of both projects the data is desired. And then under paragraph (d) the commission is authorized:

"To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, * * * or municipality * * * for the development and improvement of navigation, and for the development, transmission, and utilization of power across, along, from or in any of the navigable waters of the United States." (The language that does not refer to navigation is omitted.)

The enactment proceeds:

"Provided further, that no license affecting the navigable capacity of any navigable waters of the United States shall be issued until the plans of the dam or other structures affecting navigation have been approved by the Chief of Engineers and the Secretary of War."

And here it may be said that this is the delegation of a mere administrative detail, and cannot be the delegation of legislative power. So the following language of the act may be likewise characterized:

"Whenever the contemplated improvement is, in the judgment of the commission, desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, a finding to that effect shall be made by the commission and shall become a part of the records of the commission."

In providing for the improvement of the navigability of a stream, this power has been conferred just as it has been customary, as illus-

trated by numerous statutes which have been upheld; that is to say statutes delegating to an agent or agents whose judgment will determine the necessity for or the expediency of the selection of the particular place or the ascertainment of like essential facts. This has been the legislative practice in providing for the detailed execution of the congressional or federal policy, where the Secretary of War, for instance, or some other official of the government, has been named to act in the matter of carrying out the statute. O. S. Nav. Co. v. Stranahan, 214 U. S. 320, 29 Sup. Ct. 671, 53 L. Ed. 1013; Brushaber v. U. P. R. R. Co., 240 U. S. 1, 26, 36 Sup. Ct. 236, 60 L. Ed. 493, Ann. Cas. 1917B, 713, L. R. A. 1917D, 414; Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294; Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525; U. S. v. Grimaud, 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563.

Section 6 is that:

"Each such license shall be conditioned upon acceptance by the licensee of all the terms and conditions of this Act and such further conditions, if any, as the Commission shall prescribe in conformity with this Act, which said terms and conditions and the acceptance thereof shall be expressed in said license."

Thus the matter of license to construct the dam becomes in its nature the contract between the licensee and the government for making the improvement, and when accepted the licensee is bound to comply with its conditions or submit to forfeiture of license.

Section 10 goes more into detail, for it provides:

"That all licenses issued under this act shall be on the following conditions:

"(2) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the commission will be best adapted to a comprehensive scheme of improvement and utilization for the purposes of navigation, of water-power development, and of other beneficial public uses; and if necessary in order to secure such scheme * * *"—that is, a scheme in the interest of navigation, which is the paramount consideration—"the commission shall have authority to require the modification of any project, * * *"—and "project" includes navigation structures— "and of the plans and specifications of the project works before approval."

Further:

"(c) That the licensee shall maintain the project works in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power, shall make all necessary renewals and replacements, shall establish and maintain adequate depreciation reserves for such purposes, shall so maintain and operate said works as not to impair navigation, and shall conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health, and property."

Section 11 stipulates "that if the dam or other project works are to be constructed across, along, or in any of the navigable waters of the United States, the commission * * *" will require certain things, of which I will give the ones with reference to navigation. The act states:

"That such licensee shall, to the extent necessary to preserve and improve navigation facilities, construct, in whole or in part, without expense to the

United States, in connection with such dam, a lock or locks, booms, sluices, or other structures for navigation purposes, in accordance with plans and specifications approved by the Chief of Engineers and the Secretary of War and made part of such license."

In other words, as a fundamental requirement of the acceptance of the license, the licensee is bound to do these things in reference to navigation. Further it is, required:

"(b) That in case such structures for navigation purposes are not made a part of the original construction at the expense of the licensee then whenever the United States shall desire to complete such navigation facilities the licensee shall convey to the United States, free of cost, such of its land and its rights of way * * * through its dams, * * * and permit such control of pools as may be required to complete such navigation facilities.

"(c) That such licensee shall furnish free of cost to the United States power for the operation of such navigation facilities, whether constructed by the licensee or by the United States."

It would seem that section 11 is sufficient to show that the paramount object of the act is the promotion of navigation.

Thus has been covered in a general way the provisions relating to navigation until we get to one of vital importance here; that is, section 21. That confers upon the agency of the United States, selected under the legislative authority, which agency is the licensee, the power and duty to act in reference to the navigation project both in its construction and in its maintenance.

[19] . Now it is clear that the government has the right to condemn private property for public use and the private right or use for or benefit is immaterial so far as the validity of the Act is concerned. It is settled that Congress can delegate the right of eminent domain to a federal agency selected pursuant to the congressional authority, an agency for carrying out its policy and principles in an administrative way in the development or improvement of navigation. Of course, in the other phase of the act, dealing with waters on government reservations, public lands, the right of eminent domain of the United States is, I think, for all practical purposes not so very limited. U. S. v. Winans, 198 U. S. 383, 25 Sup. Ct. 662, 49 L. Ed. 1089; Mormon Church v. U. S., 136 U. S. 43, 10 Sup. Ct. 792, 34 L. Ed. 478.

Section 21 provides:

"That when any licensee cannot acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce it may acquire the same by the exercise of the right of eminent domain in the District Court of the United States for the district in which such land or other property may be located, or in the state courts. The practice and procedure in any action or proceeding for that purpose in the District Court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: Provided, that United States District Courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000."

It will be noted that the act giving the right of eminent domain for navigation purposes copies word for word the previous language of the act, which conferred upon the Federal Power Commission the administrative authority as agency to determine when the improvement, in the judgment of the commission, is desirable and justified in the public interest, for the purpose of promoting commerce or improving the waterway. Here are the more explicit provisions contained in the license, without reading it entirely. Article 9 of the license is that:

"Operation of the navigation facilities and the discharging of water from the dam and the control of the level of the reservoir created by the dam, are subject to such reasonable rules and regulations in the interest of navigation as may be made from time to time by the Secretary of War."

In further regard to the scope of the act, the national policy expressed in it is that the United States may at the expiration of 50 years take over any water project constructed under the act, and that if the United States does not at the end of such period take over the project the state or municipality under section 7 is given the preferential right over the original lessee to a renewal of the license. Thus the United States or the state may take over the project as stated. During the 50-year term the right is also reserved to the United States, or the state or municipality, to take it over at any time by condemnation proceedings on the payment of just compensation. These provisions and the act itself are in line with a veto message of President Taft, who said:

"I deem it highly important that the nation should adopt a consistent and harmonious policy of treatment of these water power projects which will preserve for this purpose their value to the government whose right it is to grant the permit. The necessity for the adoption of such a policy has recently been pointed out, with my approval by the Secretary of War. and I see no reason why this bill should be exempted from the safeguards which have been recommended by him in the cases of other bills now pending before Congress."

Sections 19 and 27 of the act evidence the intention of Congress, while asserting the federal power, to carefully respect the reserved power of the states. These two sections are manifestly the result of a compromise on the part of those Senators and Representatives who held the broadest view of congressional power over the subject and those of their associates most pronounced in desiring to safeguard the rights of the states. But nevertheless the purposes are the improvement and use of navigable streams for commerce, and, incidentally, the subservient use of the superabundant water at the dams for generating power, and in the same connection the intention was to negative the charge of federal usurpation and to distinctly recognize the rights of the state in navigable streams; for section 19 takes cognizance of the rights of the states to regulate the services to be rendered by public utilities to consumers of power and the rates and charges therefor. Its language is:

"That as a condition of the license, every licensee hereunder which is a public service corporation, or a person, association, or corporation owning or operating any project and developing, transmitting, or distributing power for sale or use in public service, shall abide by such reasonable regulation of the

services to be * * * rendered to * * * consumers of power, and of rates and charges of payment therefor, as may from time to time be prescribed by any duly constituted agency of the state in which the service is rendered or the rate charged. That in case of the development, transmission, or distribution, or use in public service of power by any licensee hereunder or by its customer engaged in public service within a state which has not authorized and empowered a commission or other agency or agencies within said state to regulate and control the services to be rendered by such licensee or by its customer engaged in public service, or the rates and charges of payment therefor, or the amount or character of securities to be issued by any of said parties, it is agreed as a condition of such license that jurisdiction is hereby conferred upon the Commission, upon complaint of any person aggrieved or upon its own initiative, to exercise such regulation and control until such time as the state shall have provided a commission or other authority for such regulation and control: Provided, that the jurisdiction of the commission shall cease and determine as to each specific matter of regulation and control prescribed in this section as soon as the state shall have provided a commission or other authority for the regulation and control of that specific matter."

And section 27 stipulates:

"That nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective states relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein."

I think the case of U. S. v. Chandler-Dunbar Co., 229 U. S. 53, 33 Sup. Ct. 667, 57 L. Ed. 1063, is in point, and that the doctrine there announced sustains the constitutionality of the Federal Water Power Act. It will be remembered that there the Act of March 3, 1909 (35 Stat. 815, 820 [Comp. St. § 9880]), was under review and that it authorized the Secretary of War to lease upon agreed terms any excess of water which resulted from the conservation of the flow of the river and the works which the Government constructed. It was claimed in one aspect of the Federal Water Power Act that the act of 1909 was the taking of private property for commercial uses and not for navigation. But Justice Lurton, who delivered the unanimous opinion of the court, said:

"But aside from the exclusive public purpose declared by the eleventh section of the act, the twelfth section declares that the conservation of the flow of the river is 'primarily for the benefit of navigation, and incidentally for the purpose of having the water power developed, either for the direct use of the United States, or by lease * * * through the Secretary of War.' If the primary purpose is legitimate, we can see no sound objection to leasing any excess of power over the needs of the Government. The practice is not unusual in respect to similar public works constructed by state governments. In Kaukauna Co. v. Green Bay, etc., Canal, 142 U. S. 254, 273, respecting a Wisconsin act to which this objection was made, the court said:

" 'But if, in the erection of a public dam for a recognized public purpose, there is necessarily produced a surplus of water, which may properly be used for manufacturing purposes, there is no sound reason why the State may not retain to itself the power of controlling or disposing of such water as an incident of its right to make such improvement. Indeed, it might become very necessary to retain the disposition of it in its own hands, in order to preserve at all times a sufficient supply for the purposes of navigation. If the riparian owners were allowed to tap the pond at different places, and draw off the water for their own use, serious consequences might arise, not only in connection with the public demand for the purposes of navigation, but between the riparian owners themselves as to the proper proportion each

was entitled to draw * * * controversies which could only be avoided by the state reserving to itself the immediate supervision of the entire supply. As there is no need of the surplus running to waste, there was nothing objectionable in permitting the State to let out the use of it to private parties, and thus reimburse itself for the expenses of the improvement.' "

The right of the United States to the use of the surplus water was recognized in the case where the United States had purchased the improvement on the Fox and Wisconsin rivers and permitted the grantor to reserve from the conveyance all personal property and the water power created at the dam by the use of the surplus waters not needed for the purpose of navigation, had completed and maintained the improvement at a large expense, and it was held that the reservation of the use or disposition of the surplus waters accumulated by the dams built became vested in the United States when it acquired the improvement and that the subsequent purchaser from the United States of the water power became the sole owner of the same subject only to the control and regulation of its use by the United States. Green Bay & M. C. Co. v. Patten, 172 U. S. 58, 19 Sup. Ct. 97, 43 L. Ed. 364.

A careful reading of the act under review, section by section, shows that navigation is the predominant idea of Congress. Section 10, for instance, provides that licenses issued under the Act shall be upon the following conditions: (a) The project shall be best adapted to a comprehensive scheme of improvement of navigation. (b) In subdivision "b" of said section, navigation comes first then follows life, health, and property. (c) The licensee is to maintain the project works adequate for the purpose of navigation.

Section 11 provides that the dam must be constructed so as to promote the present and future needs of navigation. Subdivision (a) of said section provides that locks, booms, sluices, or other structures for navigation purposes may be required in the first instance; and (b) if not required in the first instance, the licensee may be required to convey to the United States such of its lands and rights as may be necessary for such purpose. In section 12 reference is again made to the needs of navigation; while section 21, under which this proceeding was instituted, provides for condemnation when, in the judgment of the commission, it is necessary for improving or developing a waterway for the use or benefit of interstate commerce.

[20] Now, coming to the consideration of the third objection raised by the respondents, involving the construction of section 27 of the act, supra, a proper construction of the act requires that the words "other uses" shall be construed ejusdem generis with the words "irrigation" and "municipal." The rule is that, when in a statute general words follow a designation of particular subjects or classes, the meaning of the general words will ordinarily be presumed to be restricted by the particular designation. In accordance with this rule, such terms as "other," "other things," "others," or "any other," when preceded by a specific enumeration, are commonly given a restricted meaning and limited to things of the same nature as those previously described. 25 R. C. L. Sec. 240; 36 Cyc. 1119, 1120.

The rule was applied by the Supreme Court of the United States in

U. S. v. Chase, 135 U. S. 255, 10 Sup. Ct. 756, 34 L. Ed. 117. The court was called upon to construe the statute prohibiting the unlawful use of the mails, and held that the word "writing" must be construed in the light of the other words used in connection therewith, and that therefore it did not mean a private letter but a published writing. It was further applied in U. S. v. Bitty, 208 U. S. 393, 28 Sup. Ct. 396, 52 L. Ed. 543, construing the statute prohibiting immigration for certain immoral purposes; also in U. S. v. Steever, 222 U. S. 167, 32 Sup. Ct. 51, 56 L. Ed. 145, construing the lottery statute; and by the Supreme Court of Alabama in Amos v. State, 73 Ala. 498. See, also, the numerous cases cited in R. C. L. and Cyc., supra.

In Amos v. State, Judge Brickell, quoting authority, used the following language: "The rule [speaking of ejusdem generis] 'accords with the ordinary workings of the human mind. A writer who enumerates certain things, adding a general clause, mentions, as of course, the highest things, and some of each class, within those which he had in contemplation.' "

The only apparent exception to this rule is the case where the legislative language has completely exhausted the particular description, which is then followed by words of general import. This, however, is a recognition of the ejusdem generis rule rather than the exception, since all rules of construction require the courts to give some meaning to every word or clause used in the statute if possible. This doctrine is fully discussed in the case of U. S. v. Mescall, 215 U. S. 25, 30 Sup. Ct. 19, 54 L. Ed. 77.

Section 27, in its specific enumeration, does not exhaust the particular subject-matter, since state laws may be invoked for the following purposes, to wit, the construction of canals or other artificial waterways, the construction of a drainage system, either to take fish from the navigable waters of the state, the rights of riparian owners with respect to the formation of ice on streams, the construction of wharves, piers and docks, the right to shoot wild water fowls from boats under game laws, and perhaps others. These laws of the states are referred to and treated in the twenty-seventh volume of Ruling Case Law, p. 1061, along with the subjects of irrigation and municipal water supplies.

The conclusion is that this act authorizing the construction of dams in navigable streams to impound the water, where rocky or shoaly conditions obtain, for the purpose of improving navigation by the slack water method does not offend the Constitution. It was within the power of Congress to create a board called the Water Power Commission to carry out the purpose of Congress, and to provide that such commission should select its licensees as a proper federal agency to carry out the administrative detail of this general plan, wherever applicable for the improvement of navigation. The Act carefully provides that openings and sluiceways in the dams shall be made under the direction of the Secretary of War who acts in that particular through the Chief of Engineers. It was competent for Congress to provide that the licensees who build the dams under government supervision should re-

ceive as their compensation for their outlay the surplus water, at the weir, not necessary for navigation.

Accordingly the several objections urged against the act, being without just foundation, must be overruled. The case will proceed to the proof on the question of just compensation to be awarded to the riparian owners whose lands are ordered condemned by formal judgment now entered.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes