**The UNITED STATES of America, Plaintiff,**

**v.**

**1.04 ACRES OF LAND, MORE OR LESS, SITUATE IN CAMERON COUNTY, State of TEXAS; and Eloisa G. Tamez, et al., Defendants.**

**Civil Action No. B–08–044.**

United States District Court, S.D. Texas, Brownsville Division.

March 7, 2008.

Charles Wendlandt, Jr., U.S. Attorney's Office, Corpus Christi, TX, for Plaintiff United States of America.

Abner Burnett, South Texas Civil Rights Project, San Juan, TX, for Defendants 1.04 acres of land, more or less, situate in Cameron County, State of Texas and Eloisa G. Tamez.

Peter Schey, Center for Human Rights, Los Angeles, CA, for Defendant Eloisa G. Tamez.

**MEMORANDUM OPINION AND ORDER**

ANDREW S. HANEN, District Judge.

I. PROCEDURAL HISTORY AND NATURE OF THE OBJECTIONS

The Attorney General and Secretary of Homeland Security have been given a mandate by Congress to promptly acquire easements and immediately commence the construction of fences designed to deter illegal crossings along the United States border in areas of high illegal entry into the United States. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, § 102, 110 Stat. 3009, 3009–555. According to this mandate, the Attorney General must proceed pursuant to the authority granted by section 103(b) of IIRIRA (now codified at 8 U.S.C. § 1103(b)) to purchase and/or take the necessary easements and land through condemnation actions. 8 U.S.C. § 1103 note (Section 102(b)(2)).[1]

Plaintiff, United States of America (the "United States"), filed a complaint in condemnation against Defendant Dr. Eloisa G. Tamez ("Dr. Tamez") and her property under the authority granted by 8 U.S.C. § 1103(b)(3) and 40 U.S.C. § 3113. (Docket No. 1). The complaint sought a temporary easement on Dr. Tamez's property to conduct surveying, testing and other investigatory work necessary to plan the construction of the fence and accompanying structures designed to secure the United

1. The relevant portions of 8 U.S.C. § 1103 and its accompanying note are quoted *infra* on page 998.

States–Mexico border. (Docket No. 1, Exhibit Schedules B, E).

That same day, the United States filed a declaration of taking pursuant to 40 U.S.C. § 3114, requesting that this Court enter an *ex parte* order allowing the Government to deposit funds into the Registry of the Court and giving the Government immediate possession of the property interest pursuant to its actions under the Declaration of Taking Act ("DTA"). (Docket Nos. 2, 3, 5). This Court denied the United States' request for *ex parte* relief and held oral arguments on the motion on February 7, 2008. (Docket No. 7). Presently under consideration by this Court is the aforementioned motion as well as the opposition thereto. The Court has had the benefit of oral arguments by counsel for both parties and several written briefs from each side. (*See* Docket Nos. 5, 10, 13, 15, 16).

Dr. Tamez has also filed a countersuit, docketed as Cause Number 1:08–cv–0055, asserting similar objections to those she has raised in response to the Government's motion. As part of the countersuit, Dr. Tamez has filed a motion to certify the countersuit as a class action and a motion for a preliminary injunction. (Cause No. 1:08–cv–0055, Docket Nos. 9, 15). To further her countersuit, Dr. Tamez filed a motion to stay proceedings in this action. (Cause Number 1:08–cv–0044, Docket No. 13).[2] The present order on the United States' motion for possession will be dispositive of many, if not all, of the issues in these other pending motions and those that are not resolved will be addressed in a separate order.

Dr. Tamez raises three primary objections to the United States' motion for immediate possession and exercise of its power of eminent domain in this action. In short, she asserts that the United States must strictly comply with the procedural, negotiation and consultation provisions of IIRIRA before bringing any type of condemnation action against Dr. Tamez and her property. She contends that these provisions must be complied with prior to the United States moving forward with its process of building the fence to secure the United States–Mexico border. The authority to secure the border is set out in 8 U.S.C. § 1103 note (Section 102(b)(1) and (b)(3)), stating:

> [T]he Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.
>
> . . .
>
> The Attorney General, acting under the authority conferred by [8 U.S.C. § 1103(b) ] shall promptly acquire such easements as may be necessary to carry out [8 U.S.C. § 1103 note (Section 102(b)) ] and shall commence construction of fences immediately following such acquisition. . . .

The authority for the acquisition is then set out in 8 U.S.C. § 1103(b)(2)-(3), which provide:

> (2) The Attorney General may contract for or buy any interest land . . . as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.
>
> (3) When the Attorney General and the lawful owner of an interest . . . are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to the Act of August 1, 1888 (Chapter 728; 25 Stat. 357).

2. Dr. Tamez's motion to stay is being denied by this Court on this day in a separate order.

Dr. Tamez first asserts that by referencing only the Act of August 1, 1888, otherwise known as the General Condemnation Act of 1888 ("GCA") (currently codified at 40 U.S.C. § 3113), IIRIRA requires the United States to bring any condemnation action by the straight-condemnation procedure and not through the expedited procedure set out in the DTA. In this action, the United States filed both a complaint in condemnation and a declaration of taking and is seeking to proceed pursuant to the procedure of the DTA. (*See* Docket No. 2). Dr. Tamez, thus, asserts that the United States has exceeded its authority under IIRIRA and that the United States must bring a new action solely under the straight-condemnation procedure.

Second, Dr. Tamez asserts that 8 U.S.C. § 1103(b)(2)-(3), as set out above, mandate negotiations with landowners that: (i) must precede the filing of a condemnation action; and (ii) has not been attempted by the United States. Finally, Dr. Tamez asserts that the United States must strictly comply with a consultation provision enacted by Congress in December of 2007 before bringing any condemnation action, and that the United States has so far failed to do so. This consultation provision requires the Secretary of Homeland Security to consult with "property owners ... to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed." Consolidated Appropriations Act, 2008, Pub.L. No. 110–161, § 564, 121 Stat. 1844, 2090–91 (2007).

## II. DEFENSES AVAILABLE TO A LAND OWNER IN A CONDEMNATION ACTION

■ The sole defense to a condemnation action is that the United States lacks the authority to take the interest sought in the complaint in condemnation. *United States v. 162.20 Acres of Land, More or Less, Situated in Clay County, State of Mississippi,* 639 F.2d 299, 303 (5th Cir.1981). Writing for the Fifth Circuit Court of Appeals, Judge Reynaldo Garza stated that judicial review in condemnation actions is limited to "the bare issue of whether the limits of authority were exceeded." *Id.* A property owner's challenge to a condemnation action is properly defined as an objection to the validity of the taking for "departure from the statutory limits." *Id.* (citing *Catlin v. United States,* 324 U.S. 229, 240, 65 S.Ct. 631, 89 L.Ed. 911 (1945)). The Fifth Circuit warned that a court should not "second-guess governmental agencies" on the issues of necessity, expediency, policy and propriety in a condemnation action as "such matters are within the discretion of ... the administrative bodies by delegation." *Id.*

The Fifth Circuit's decision in *United States v. 2,606.84 Acres of Land in Tarrant County, Texas* gives an example of what constitutes permissible review:

> [W]e think that if Congress had never authorized a dam on the Clear Fork of the Trinity River, then the landowner might here claim under the *Catlin* rule that his land was being taken for an unauthorized purpose. However, once Congress approved the Benbrook Dam, the taking for any purpose associated with that project was an authorized purpose, and the landowner cannot be heard to complain that the condemnation was not necessary to the dam's construction or operation.
>
> *The only exception to this rule would occur if the delegated official so overstepped his authority that no reasonable man could conclude that the land sought to be condemned had some association with the authorized project.* In such a case *alone* could the taking be considered arbitrary or capricious as those terms are used in condemnation

> proceedings. There must be basic to the project pervasive deception, unreasoned decision, or will-of-the-wisp determination before these words of pejoration are brought into play.

432 F.2d 1286, 1290 (5th Cir.1970) (emphasis added).

Section 1103(b) of Title 8, enacted as part of IIRIRA in 1996, gives the Attorney General the authority to bring condemnation actions for land and interests "essential to control and guard the boundaries and borders of the United States...." 8 U.S.C. § 1103(b)(1), (3). Dr. Tamez, while no doubt displeased at the prospect, does not challenge these sections nor the right of the United States to take an interest in her land for the purpose of securing the United States border. Instead, she objects only to the manner in which the United States has chosen to exercise that right.

An objection to the manner of a taking rather than to the purpose of the taking may be properly characterized as a question of the "expediency" of the taking, a question which the Fifth Circuit ruled that this Court cannot consider. *See 162.20 Acres of Land,* 639 F.2d at 303. It is arguable, however, that allowing a property owner to challenge a "departure from statutory limits" may permit Dr. Tamez's challenge to whether the United States has followed the requisite statutory procedure in a condemnation action. *See id.* There are two competing standards relating to a court's review of whether the United States complied with the necessary procedures in a condemnation action. The first requires strict construction when applying eminent domain procedures; the second grants liberal construction to eminent domain procedures to effectuate the purpose of the taking.

A. Strict Construction of Eminent Domain Statutes

When federal condemnation actions were based on a multitude of state-law procedures, several federal courts required strict compliance with those procedures.[3] *See United States v. 2.4 Acres of Land, More or Less, in Lake County, Illinois,* 138 F.2d 295, 298 (7th Cir.1943). These procedures must be "followed closely at every step of the proceeding, otherwise [the] sovereign acquires no title to the property attempted to be condemned." *United States v. 8,557.16 Acres of Land in Pendleton County, West Virginia,* 11 F.Supp. 311, 313 (N.D.W.Va.1935). Relying on these and other similar holdings, Dr. Tamez asserts that the condemnation, negotiation and consultation procedures set out in IIRIRA must be strictly followed.

B. Liberal Construction of Eminent Domain Statutes

The United States responds that the more recent trend is to interpret condemnation provisions liberally to effectuate the purpose of the acquisition, here, the securing of the United States–Mexico border. The Ninth Circuit Court of Appeals held that eminent domain statutes are to be construed in view of the statute's purpose. *United States v. Kennedy,* 278 F.2d 121, 126 n. 17 (9th Cir.1960) (citing 3 Sutherland Statutory Construction § 64.06 (6th ed. 2007)). The Government contends that eminent domain statutes and the federal condemnation power can be liberally construed "without an express statutory direction to so." *United States v. 1.33 Acres,* 9 F.3d 70, 72 (9th Cir.1993). "The rule that grants of the power of eminent domain are to be strictly interpreted against the government and in favor of the property owner generally has not been

3. A history of court procedures in condemnation actions can be found *infra* at Section III.

applied to federal statutes authorizing executive officers ... to condemn property. Emphasis has been focused upon the purposes to be accomplished, and such legislation has been treated with extremely liberally to effectuate the federal projects." 3 Sutherland Statutory Construction § 64.06 (6th ed. 2007); *1.33 Acres,* 9 F.3d at 72; *Kennedy,* 278 F.2d at 126 n. 17.

C. Judicial Review in this Case

Due to the importance of these issues, this Court, without trying to resolve the conflict between these two lines of cases, will review the objections raised by Dr. Tamez, including her primary objection: whether the United States, having the authority to take the property, has nonetheless departed from strict compliance with the procedural requirements established by the authorizing statute.

## III. THE GENERAL CONDEMNATION ACT AND THE DECLARATION OF TAKING ACT

### A. The General Condemnation Act of August 1, 1888

For much of the early history of the United States, the federal government only filed condemnation actions in state courts. *See United States v. Carmack,* 329 U.S. 230, 237, 67 S.Ct. 252, 91 L.Ed. 209 (1946) (describing the transition of condemnation actions from state to federal court). In 1875, the Supreme Court ruled that the United States was not limited to filing actions in state court. *Kohl v. United States,* 91 U.S. 367, 372, 23 L.Ed. 449 (1875) (upholding a federal taking by an act of Congress). Thirteen years later, the GCA opened the doors of federal courts to condemnation actions filed by authorized officers of the United States. *See* General Condemnation Act of August 1, 1888, 25 Stat. 357. The Act provided that:

Section 1

In every case in which the Secretary of Treasury, or any other officer of the government has been, or hereafter shall be, authorized to procure real estate for the erection of a public building or for other public uses he shall be, and hereby is, authorized to acquire the same for the United States by condemnation, under judicial process, whenever in his opinion it is necessary or advantageous to the government to do so, and the United States Circuit or District Courts of the district wherein such real estate is located, shall have jurisdiction of proceedings for such condemnation, and it shall be the duty of the Attorney General of the United States, upon every application of the Secretary of the Treasury, under this act, or such other officer, to cause proceedings to be commenced for condemnation within thirty days from the receipt of the application at the Department of Justice.

Section 2

The practice, pleadings, forms and modes of proceeding in causes arising under the provisions of this act shall conform, as near as may be, to the practice, pleadings, forms, and proceedings existing at the time in like causes in the courts of record of the state within which such circuit or district courts are held, any rule of the court to the contrary notwithstanding.

25 Stat. 357 (now codified, in part, at 40 U.S.C. § 3113). It is clear that the GCA, as enacted, did not create procedures for the United States to follow when filing a condemnation action in federal court. *See id.* Instead, the GCA required the United States to use the condemnation procedures of the state in which the property the United States sought to acquire was located. *See id.* at § 2.

Section 1 of the GCA was formerly codified as 40 U.S.C. § 257 and is now codified

as 40 U.S.C. § 3113. *See* 40 U.S.C. § 3113. Section 2 of the Act was codified separately as 40 U.S.C. § 258 and has now been superseded by Federal Rule of Civil Procedure 71.1. *See West, Inc. v. United States,* 374 F.2d 218, 223–24 (5th Cir.1967). The language of § 3113 is nearly identical to the original language of Section 1 of the Act of August 1, 1888, and clearly still does not create a specific procedure to be used in condemnation actions. *See* § 3113.

B. Federal Rule of Procedure 71.1

Section 2 of the GCA, requiring the United States to use state-law condemnation procedures, meant there were over 300 different state procedures the United States might use when exercising its condemnation power in federal courts across the country. *See* Fed.R.Civ.P. 71.1 Advisory Committee's note (Original Report). This wide array of procedures led to undue delay, expense and uncertainty. *Id.* During the Great Depression and World War II, the number of condemnation actions rose and there was a "general feeling of dissatisfaction with the diverse condemnation procedures that were applicable in the federal courts." *Id.* This dissatisfaction encouraged a "belief ... that both the sovereign's power to condemn and the property owner's right to compensation could be promoted by simplified rule." *Id.*

The result was the adoption of Federal Rule of Civil Procedure 71A (now Rule 71.1) in 1951. Fed.R.Civ.P. 71.1 Advisory Committee's note (Original Report). Rule 71.1 established a uniform set of procedures to govern all federal condemnation actions. *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 4 n. 2, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (citing Fed.R.Civ.P. 71.1 Advisory Committee's note (Original Report)). Rule 71.1 sets out, in conjunction with 40 U.S.C. § 3113, the procedure now commonly referred to as the "straight-condemnation" action. *Id.* at 3, 104 S.Ct. 2187. In such an action, the United States files a complaint in condemnation in federal court identifying the property and interest the Government seeks to take. *Id.* at 4, 104 S.Ct. 2187; Fed.R.Civ.P. 71.1(c). This filing is followed by a trial on the question of just compensation. *Kirby Forest Indus., Inc.,* 467 U.S. at 4, 104 S.Ct. 2187; Fed.R.Civ.P. 71.1(h). The Government then has the option of whether to purchase the interest in property at the level of compensation determined by the trial, and if it elects to tender payment of that determined amount, title and right to possession then vest in the United States. *Kirby Forest Indus., Inc.,* 467 U.S. at 4, 104 S.Ct. 2187.

C. The Declaration of Taking Act

The DTA was enacted in 1931[4] and created a procedure to expedite the taking of title and possession of lands to enable the United States to begin construction work before final judgment. *See* H.R. Rep. No. 71–2086 (1930) (statement of Rep. Graham of the House Committee on the Judiciary). The DTA provides:

> In any proceeding in any court of the United States outside the District of Columbia brought by and in the name of the United States and under the authority of the Federal Government to acquire land, or an easement or right of way in land, for the public use, the petitioner may file, with the petition or at any time before judgment, a declaration of taking signed by the authority empowered by law to acquire the land described in the petition, declaring that the land is taken for the use of the Government.

4. The Declaration of Taking Act was originally codified as 40 U.S.C. § 258a and is presently codified as 40 U.S.C. § 3114.

40 U.S.C. § 3114(a). The DTA also: (i) sets out requirements for filing a declaration of taking and a deposit of estimated compensation; (ii) states when title in the interest sought will vest in the United States; and (iii) explains how interest on awards of just compensation are affected when the United States proceeds using a declaration of taking. *See* § 3114(a)-(e). Congress also enacted several other provisions at the same time as the DTA, helping to define how the DTA relates to existing condemnation procedures. *See* §§ 3115–3118. One of these provisions is 40 U.S.C. § 3118, which states:

> The right to take possession and title in advance of final judgment in condemnation proceedings as provided by [the Declaration of Taking Act] is in addition to any right, power, or authority conferred by the laws of the United States ... under which the proceeding may be conducted and does not abrogate, limit, or modify that right, power or authority.

## IV. THE ILLEGAL IMMIGRATION REFORM AND IMMIGRANT RESPONSIBILITY ACT OF 1996

### A. Title 8 U.S.C. § 1103(b)

Section 1103(b) of Title 8 was enacted as part of IIRIRA in 1996. *See* Pub.L. No. 104–208, § 102, 110 Stat. 3009, 3009–555 (1996).[5] This section of IIRIRA gives the Attorney General the authority to purchase or bring condemnation actions to acquire lands in the vicinity of the United States–Mexico border. 8 U.S.C. § 1103. There have been no substantive amendments to section 1103(b) since IIRIRA was enacted in 1996.

### B. Section 102 of IIRIRA

IIRIRA also added section 102 to the note of 8 U.S.C. § 1103. *See* Pub.L. No. 104–208, § 102, 110 Stat. 3009, 3009–555 (1996). As enacted, this section permitted the Attorney General to take action to deter illegal border crossings and to construct 14 miles of fencing along the United States–Mexico border near San Diego, California. *Id.* The Attorney General was required to "promptly acquire such easements as may be necessary to carry out this section and ... commence construction of fences immediately following such acquisition...." *Id.*

Congress has revisited or amended section 102 several times since 1996. The Homeland Security Act of 2003, Pub.L. No. 107–296, § 446, 116 Stat. 2135, 2195 (2002), made completing the border fence near San Diego, California a priority. *Id.* The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, added a waiver provision to section 102, enabling the Secretary of Homeland Security to remove, "notwithstanding any other provision of law ... all legal requirements [the] Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction" of the border fence and accompanying infrastructure. Pub.L. No. 109–13, § 102, 119 Stat. 231, 306 (2005).

Congress then enacted substantial amendments to section 102 in the Secure Fence Act of 2006. Pub.L. No. 109–367, § 3, 120 Stat. 2638, 2638–39 (2006). These amendments expanded the construction of the fence to include specific areas along the entire United States–Mexico border, including the Rio Grande Valley in Texas. *Id.* Additionally, Congress made the construction of the fence between Laredo and Brownsville, Texas a priority, with construction to be completed by December 31, 2008. *Id.* According to the Secure Fence Act, however, the Secretary of Homeland Security did not need to build a fence in

5. Section 1103(b) of Title 8 was set out, in pertinent part, *supra* in Section I.

areas where the elevation grade of the land exceeded ten percent. *Id.* For these stretches of steeply graded land, the Act contemplates that barriers other than a fence could be used to secure the border. *Id.*

Most recently, Congress made amendments to section 102 on December 26, 2007, as part of the Consolidated Appropriations Act, 2008. Pub.L. No. 110–161, § 564, 121 Stat. 1844, 2090–91 (2007). The amendments removed references to specific areas for the construction of the fence, giving the Secretary discretion on where to put the fencing. *Id.* The Secretary of Homeland Security now has a general mandate to construct at least 700 miles of fencing along the United States–Mexico border where fencing would be most practical and effective. *Id.* The Consolidated Appropriations Act also requires that the Secretary complete construction of approximately 370 miles of reinforced fence in priority areas, including the Rio Grande Valley, by December 31, 2008. *Id.* This Act also added a consultation provision and savings provision to section 102:

> (i) IN GENERAL—In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.
>
> (ii) SAVINGS PROVISION—Nothing in this subparagraph may be construed to—
>
> (I) create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or
>
> (II) affect the eminent domain laws of the United States or of any State.

*Id.*

## V. DISCUSSION

### A. Condemnation Procedure Authorized by 8 U.S.C. § 1103(b)(3)

IIRIRA authorized the Attorney General to bring condemnation actions "pursuant to the Act of August 1, 1888" (i.e., the GCA). 8 U.S.C. § 1103(b)(3) (as originally enacted in 1996 by Pub.L. No. 104–208, § 102, 110 Stat. 3009, 3009–555 (1996)). Dr. Tamez asserts that the statute's reference to the GCA allows the United States to *only* use the straight-condemnation procedure. Section 1103(b)(3) does not specifically cite to the DTA, and Dr. Tamez contends that Congress, therefore, implicitly prohibited the use of the expedited procedure of the DTA.

Dr. Tamez relies on two sources of support for her assertion that a reference to only the "Act of August 1, 1888" limits the United States to use of the straight-condemnation procedure: (i) case law describing the difference between the straight-condemnation procedure of the GCA and the expedited procedure of the DTA; and (ii) principles of statutory construction requiring this Court to look only to the plain language of the statute. Initially, Dr. Tamez contends that cases such as *Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 3, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) and *Narramore v. United States,* 960 F.2d 1048, 1050 (Fed.Cir.1992) stand for her premise that the GCA establishes the straight-condemnation procedure while the DTA authorizes a separate expedited procedure requiring separate authorization from Congress. She asserts that Congress was aware of this distinction and, by citing only the GCA, Congress purposefully excluded the more expedient DTA procedure.

The United States counters that the plain language of the DTA and the case law interpreting the DTA demonstrate that the United States is authorized to use and may elect to use the expedited procedure of the DTA in any condemnation proceeding brought under the general grant of judicial access in the GCA, just as the United States may use the straight-condemnation procedure outlined in Rule 71.1 whenever it is authorized to act pursuant to the GCA.[6] The DTA states that the United States may use its expedited procedure "in any proceeding ... under the authority of the Federal Government to acquire land, or an easement or right of way in land, for the public use...." 40 U.S.C. § 3114(a). Obviously, a proceeding brought pursuant to the GCA would qualify as a "proceeding ... under the authority of the Federal Government to acquire land."

This Court noted above, when discussing the history of condemnation statutes, that the GCA, as enacted on August 1, 1888, contained no specific procedures and, in actuality, authorized by reference nearly 300 different procedures for the use of the United States in condemnation actions. *See* 25 Stat. 357; Fed.R.Civ.P. 71.1 Advisory Committee's note (Original Report). This language has not been substantially changed in nearly 120 years. *Compare* § 3113 *with* 25 Stat. 357. Today, the plain language of the GCA, while codifying and memorializing the sovereign's right to take property by eminent domain in federal court, still provides no specific procedure, let alone the straight-condemnation procedure. *See* 40 U.S.C. § 3113.

The GCA provides access to federal courts, and Rule 71.1 sets out this general procedure for condemnation actions. *Compare* 40 U.S.C. § 3113 *with* Fed. R.Civ.P. 71.1. The GCA does not mention Rule 71.1, yet the use of Rule 71.1 in a condemnation action is simply understood to be available in any case brought under 40 U.S.C. § 3113. This relationship between the GCA and Rule 71.1 was noted by the Supreme Court in its ruling in *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 3, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (holding that Rule 71.1, in conjunction with 40 U.S.C. § 3113, authorizes the straight-condemnation procedure). This relationship, as noted by the Supreme Court, is somewhat different than Dr. Tamez's proposition that 40 U.S.C. § 3113 by itself authorizes the straight-condemnation procedure.

6. In its response, the Government's reply also appears to rely on an argument that the requirements of 8 U.S.C. § 1103(b) and 40 U.S.C. §§ 3113–3114 may be mitigated by the fact that, at this point, the United States is only seeking a "minimally intrusive, non-exclusive, temporary right of entry for conducting *investigatory work—not* the construction of a fence or other type of security barrier." *See* Reply of the United States at p. 2 (emphasis in original). While, practically speaking, that argument has some appeal, it is not supported by any well-established legal tenets. This Court has no discretion to consider the extent or nature of the interest sought by the United States. *See, e.g., United States v. 162.20 Acres of Land, More or Less, Situated in Clay County, State of Mississippi,* 639 F.2d 299, 303 (5th Cir.1981). The Court can only consider whether the United States is exceeding its statutory authority in this taking action, therefore, it must determine that either: (i) the United States has the authority to proceed in the manner it has chosen with regard to all property interests, large and small, sought in the investigation and construction of the border fence, or (ii) the United States does not have the authority regardless of the minimal nature of the interest sought or taken. *See id.* This Court is unpersuaded by the United States' argument that the "minimally intrusive" nature of the interest sought somehow changes the controlling law and this Court holds it must base its decision solely on the law and principles of statutory construction, regardless of the extent of the estate being sought.

Just like Rule 71.1 and its procedures are not mentioned in the GCA, neither are the DTA and its expedited procedure. The GCA does not provide for any procedure at all—straight, expedited, or otherwise. *See* 40 U.S.C. § 3113. This Court finds that decisions that distinguish between straight-condemnation and expedited procedures based on references to the GCA and DTA, respectively, do so simply for convenience of description when presenting the various methods the Government has used to condemn property. This Court has not found any decision on the issue here: what procedure does Congress authorize by a reference to the GCA, 40 U.S.C. § 3113. Nevertheless, the plain language and history of the GCA, first authorizing multiple procedures and now authorizing no particular procedure, do not dictate Dr. Tamez's proposed conclusion that the GCA, 40 U.S.C. § 3113 and DTA, 40 U.S.C. § 3114 set out mutually exclusive procedures.

The relationship of the DTA to condemnation proceedings authorized by the GCA has been described in a number of ways. The United States Supreme Court stated that the provisions of the DTA are "ancillary or incidental" to condemnation actions. *United States v. Dow,* 357 U.S. 17, 22, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (quoting *Catlin v. United States,* 324 U.S. 229, 240, 65 S.Ct. 631, 89 L.Ed. 911 (1945)); *see Bishop v. United States,* 288 F.2d 525, 527–28 (5th Cir.1961); *Polson Logging Co. v. United States,* 149 F.2d 877, 878 (9th Cir.1945). *Catlin,* one of the most cited cases on the subject, held that the DTA "... is not an independent one [statute] for condemnation. It provides for no new condemnation proceeding. It merely affords steps ancillary or incidental to suits brought under other statutes...." *Catlin,* 324 U.S. at 240, 65 S.Ct. 631.[7]

The Fifth Circuit Court of Appeals has called the DTA "complementary and congenial" to Rule 71.1, *West, Inc. v. United States,* 374 F.2d 218, 224 (5th Cir.1967), and referred to the DTA as "ancillary or incidental to suits brought under other statutes" and "a mechanism by which to facilitate the exercise of the sovereign's power of eminent domain and give full practical protection to both Government and owner alike," *Bishop,* 288 F.2d at 527–28. A court in this very district has stated that the DTA must be construed along with 40 U.S.C. § 3113 and 40 U.S.C. § 258 (superseded by Rule 71.1). *See United*

7. This Court finds additional support for viewing the DTA as ancillary and incidental to the main condemnation proceedings from the Supreme Court's decision in *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). There, the Court was faced with legislation enacted by Congress creating the Big Thicket National Preserve ("Big Thicket"). *Id.* at 7, 104 S.Ct. 2187. The legislation gave the Secretary of the Interior the authority to acquire land to create Big Thicket. An Act to Authorize the Establishment of the Big Thicket National Preserve in the State of Texas, and for Other Purposes, Pub.L. No. 93–439, 88 Stat. 1254, 1254 (1974); *see Kirby Forest Indus., Inc.,* 467 U.S. at 7, 104 S.Ct. 2187. Congress and the Supreme Court both indicated that, while the use of a condemnation action was not mentioned in the legislation, the general grant of authority to acquire land permitted the Secretary of the Interior to bring condemnation actions against land owners. *Id.;* S. Rep. No. 93–856, at 5–6 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5554, 5558. Additionally, both Congress and the Supreme Court stated that both the straight-condemnation procedure and the expedited procedure of the DTA were available for the use of the Government in the acquisition. *Kirby Forest Indus., Inc.,* 467 U.S. at 7, 104 S.Ct. 2187; S. Rep. No. 93–856, at 5–6 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5554, 5558. These statements reveal to this Court that the Supreme Court and Congress implicitly endorsed the concept that the procedure of the DTA is available whenever the Government is given a general grant of authority to proceed through condemnation actions.

*States v. 2,049.85 Acres of Land,* 45 F.Supp. 731, 732 (S.D.Tex.1942).

The Eighth Circuit Court of Appeals held that the DTA "establishes a separate, optional step in the condemnation process, supplemental to the main condemnation procedures outlined in Rule 71 [now Rule 71.1]." *United States v. Herring,* 750 F.2d 669, 673 (8th Cir.1984); *see also United States v. 729.773 Acres of Land, More or Less, Situate in the City and County of Honolulu, State of Hawaii,* 531 F.Supp. 967, 972 (D.Haw.1982) (declaring the DTA to be a supplemental statute that is permissive in nature); *United States v. 70.39 Acres of Land, More or Less, in the County of San Diego, State of California,* 164 F.Supp. 451, 469 (S.D.Cal.1958) (holding that the DTA is a supplementary condemnation statute that adds to the other condemnation statutes); *United States v. 17,280 Acres of Land, More or Less, Situated in Saunders County, Nebraska,* 47 F.Supp. 267, 269 (D.Neb.1942) (same); *see also United States v. Catlin,* 142 F.2d 781, 784 (7th Cir.1944) *aff'd Catlin v. United States,* 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911 (1945) ("If it [the government] has the authority to condemn, there follows under the Act [the DTA] the absolute right to take.... In other words, the authority to condemn and the right to take must stand or fall together."); *United States v. 15.3 Acres of Land, More or Less, Situate in the City of Scranton, County of Lackawanna and Commonwealth of Pennsylvania,* 158 F.Supp. 122, 124 (M.D.Penn.1957) ("... [Section] 258a [the DTA] does not assume to erect a complete condemnation procedure. It provides rather a supplemental and optional course...."); FED. R.CIV.P. 71.1, Advisory Committee's note (Original Report).

The more persuasive cases (including those of the United States Supreme Court and of the Fifth Circuit) repeatedly refer to the DTA as ancillary, incidental or supplemental to the main condemnation proceeding. Black's Law Dictionary defines both "ancillary" and "incidental" as subordinate. BLACK'S LAW DICTIONARY 95, 777 (8th ed. 2004). This subordinate nature of the DTA is codified at 40 U.S.C. § 3118, which states that the "right to take possession and title ... as provided by [the DTA] is in addition to any right, power, or authority ... under which the proceeding may be conducted, and does not abrogate, limit, or modify that right, power or authority." Given the supplemental nature of the DTA, this Court finds that the provisions of the DTA are available whenever an officer of the United States is authorized to bring a condemnation action in federal court pursuant to the GCA, 40 U.S.C. § 3113. The right to use the provisions of the DTA is inherent and incidental in all condemnation actions brought under the GCA; thus, this Court finds that Congress does not need to expressly authorize the use of the provisions of the DTA when it otherwise gives the United States authority to proceed under the GCA. *See Polson Logging Co. v. United States,* 149 F.2d 877, 878 (9th Cir.1945) (holding that the right of the United States to use the expedited procedures of the DTA is "a right of the United States in all proceedings for condemnation").

This Court's holding is reinforced by the plain language of both the GCA and the DTA. The GCA grants officers of the United States "judicial access" rather that prescribing any particular procedure. *See* 40 U.S.C. § 3113. The DTA, by its own terms, can only apply after a condemnation action has already begun in a federal court. 40 U.S.C. § 3114; *see United States v. Dow,* 357 U.S. 17, 23, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958) (holding that the DTA "does not bestow independent authority to condemn lands for public use" and that its procedures can be "instituted either at the commencement of the con-

demnation suit [or] ... after such suit has been commenced and either before or after the Government has taken possession"). "[T]he petitioner may file, with the petition or at any time before judgment, a declaration of taking...." 40 U.S.C. § 3114(a). The "petition" referred to in the DTA is that brought by the Government under the GCA. The Court finds that the DTA, therefore, is a tool to be used in conjunction with actions brought pursuant to the GCA.

Dr. Tamez does not challenge the Government's ability to bring condemnation actions under the GCA. *See* 8 U.S.C. § 1103(b)(3). Since Congress has authorized the Attorney General to bring condemnation actions in federal court pursuant to 40 U.S.C. § 3113, the procedures set out in Rule 71.1 and the DTA are available to the United States in those actions, ancillary to the Government's authority to bring the action under the GCA. The Government, therefore, did not exceed its authority by using the provisions of the DTA in this action, where it has already been authorized to proceed under the GCA. *See* 8 U.S.C. § 1103(b)(3). Further, this Court notes that 8 U.S.C. § 1103(b)(3), the provision authorizing condemnation proceedings, uses the term "may" rather then "shall" with regard to the use of 40 U.S.C. § 3113. 8 U.S.C. § 1103(b)(3). This permissive nature of the language in the authorizing provision adds additional support to this Court's holding that Congress did not intend to limit the procedures available to the Government when bringing condemnation actions pursuant to 8 U.S.C. § 1103(b)(3).

B. The IIRIRA "Unable to Agree" Provision

Dr. Tamez also contends that IIRIRA mandates negotiation with landowners before the United States may bring a condemnation action. *See* 8 U.S.C. § 1103(b)(2)-(3). She relies on principles of statutory construction for her contention that 8 U.S.C. § 1103(b)(2)-(3) requires negotiation and discussion with property owners. She avers that no such negotiation has occurred. (Def. Response, Ex. 2, Decl. of Eloisa Garcia Tamez [hereinafter Decl. of Tamez] at ¶ 14). Section 1103(b)(2) permits the Attorney General to purchase an interest in land as soon as the owner of the interest fixes a price for it and the Attorney General considers the price to be reasonable. 8 U.S.C. § 1103(b)(2). Section 1103(b)(3), as discussed earlier in this opinion, gives the Attorney General the authority to bring a condemnation action when the United States and the owner "are unable to agree upon a reasonable price." *Id.* at § 1103(b)(3).

When construing a statute, words must be given their ordinary meaning and the language of the statute must not be rendered meaningless. *White v. Black,* 190 F.3d 366, 368 (5th Cir.1999). Dr. Tamez contends that the ordinary meaning of the phrase "unable to agree" is that some attempt at agreement or negotiations must be made. She also relies on Fifth Circuit precedent for this assertion, stating that, where possible, statutes must be read so as to give meaning to each provision. *See United States v. Caldera-Herrera,* 930 F.2d 409, 411 (5th Cir.1991). Allowing the United States to bring its condemnation action without any reference or evidence of its compliance with the negotiation requirement in the same statute and provision that authorized the condemnation action, Dr. Tamez asserts, would violate the basic principles of statutory construction.

1. When the Term "Unable to Agree" Creates a Condition Precedent

An attempt to reach an agreement with the owner for the purchase of property is not a condition precedent to

condemnation proceedings, unless a statutory provision requires such an attempt. *United States v. Certain Interests in Property in County of Cascade, State of Montana (County of Cascade),* 163 F.Supp. 518, 524 (D.Mont.1958) (citing *United States v. Certain Interests in Land Situate in Franklin County, Illinois,* 58 F.Supp. 739, 741 (E.D.Ill.1945)); *Via v. State Comm'n on Conservation and Dev. of State of Virginia,* 9 F.Supp. 556, 563 (W.D.Va.1935); *In re Condemnations for Improvement of Rouge River (Rouge River),* 266 F. 105, 119 (E.D.Mich.1920); *see United States v. Meyer,* 113 F.2d 387, 394 (7th Cir.1940). Such a condition must be enacted by Congress in the statute authorizing an official to proceed with a condemnation action. *Meyer,* 113 F.2d at 394 (citing *Rouge River,* 266 F. at 118); *Via,* 9 F.Supp. at 563 (citing Lewis on Eminent Domain § 301 (1st Ed.)). Indefinite language does not create a requirement to negotiate prior to bringing a condemnation action. *Rouge River,* 266 F. at 119. A negotiation requirement must be shown to have been expressly imposed by Congress on the Government's right to exercise its power of eminent domain. *Id.*

■ "It is a familiar rule that a statute which, either expressly or by necessary implication, gives a discretionary power to any public official, to be exercised by him upon his opinion concerning certain facts, constitutes him the sole and exclusive judge of the existence of such facts." *Rouge River,* 266 F. at 118–19 (citing *Mullan v. United States,* 140 U.S. 240, 11 S.Ct. 788, 35 L.Ed. 489 (1891); *Kennedy v. Gibson,* 75 U.S.(8 Wall.) 498, 19 L.Ed. 476 (1869); *Martin v. Mott,* 25 U.S.(12 Wheat.) 19, 6 L.Ed. 537 (1827)). The statute at issue in *Rouge River* stated that if "unable for any reason to obtain [an interest in land] by purchase ... the Secretary of War may, in his discretion, cause proceedings to be instituted in the name of the United States for the acquirement by condemnation of said land or easement...." *Id.* at 107. The court held that the question of whether the Government was unable to purchase an interest in land fell into the broader question of necessity for bringing the condemnation action. *Id.* at 118. The court held that the statutory language set forth above *did not* demonstrate that Congress had made an express imposition of a requirement to negotiate with the landowner:

> The Secretary of War is the representative of the government, whose duty it is to determine whether such proceedings are to be instituted. The inability of the local interests to obtain by purchase the land sought to be donated to the Government is one of the facts to be considered by the Secretary of War in determining whether he will, as Congress has provided that he may, 'in his discretion,' cause such proceedings to be instituted in the name of the United States for the acquirement of such land. I am of the opinion that this is a fact the existence of which must of necessity be decided by the Secretary of War in accordance with his own judgment.

*Id.* at 119–20.

■ Unlike the *Rouge River* situation, the statute in question directly references, in two different sections, negotiations between landowners and the government. Section 1103(b)(2) of Title 8 states, "[t]he Attorney General may contract for or buy any interest in land ... as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable." If the "Attorney General and the lawful owner of an interest ... *are unable to agree* upon a reasonable price, *the Attorney General may commence* condemnation proceedings...." *Id.* at § 1103(b)(3) (emphasis added). The language of 8 U.S.C. § 1103(b)(3) clearly contemplates that

some attempt has been made to reach an agreement prior to the Attorney General exercising the authority to pursue eminent domain remedies. *See id.* In contrast to the statute in *Rouge River*, under 8 U.S.C. § 1103(b), the attempt to reach an agreement is not discretionary, but rather it is an action that must precede an acquisition by the Government. This Court finds that Congress clearly intended there to be some level of negotiation between the Government and the owner of a property interest prior to the institution of eminent domain procedures pursuant to 8 U.S.C. § 1103(b)(3).

2. The Requirement of a Bona Fide Effort

The issue of whether the Government has satisfied the requirement of negotiating with a property owner does not go to the jurisdiction of the court. *Wilson v. Union Elec. Light & Power Co.*, 59 F.2d 580, 582 (8th Cir.1932). This court has general jurisdiction over the subject matter in this case and jurisdiction over the parties. *See id.* Under appropriate allegations, the court is authorized to act in this case. *See id.* This Court, having jurisdiction, must then turn to what the Government must show to satisfy the negotiation requirement of 8 U.S.C. § 1103(b)(3).[8]

Where a statute requires an attempt to purchase prior to condemnation, it is not necessary that there be an "absolute inability" to acquire the property by purchase, but only that there be a bona fide effort on the part of the condemning party.[9] *County of Cascade*, 163 F.Supp. 518, 524 (D.Mont.1958) (citing *Wilson*, 59 F.2d at 581); *see Thornton Dev. Auth. v. Upah*, 640 F.Supp. 1071, 1075 (D.Colo. 1986) (requiring a reasonable effort with a minimal notion of good faith negotiation); *Kerr v. Raney*, 305 F.Supp. 1152, 1156 (W.D.Ark.1969). "It is sufficient that negotiations proceed far enough to indicate that an agreement is impossible, and, where it is apparent that the parties cannot agree on the amount to be paid, a formal effort to agree is not necessary." *County of Cascade*, 163 F.Supp. at 524 (quoting 29A C.J.S. *Eminent Domain*

8. This Court notes that where some, but not all defendants, question whether the condemnor negotiated in good faith, a court may grant the condemnor the authority to take with regard to those who did not contest the negotiations. *USG Pipeline Co. v. 1.74 Acres in Marion County, Tennessee*, 1 F.Supp.2d 816, 822 (E.D.Tenn.1998). This Court, to date, has followed this course.

9. The Court notes at the outset that 8 U.S.C. § 1103(b) may be read to suggest a negotiation procedure that is the reverse of the normal pattern of negotiation discussed in cases in this section. Typically, the Government makes an initial offer for a property owner's interest in land. *See, e.g., Thornton Development Auth. v. Upah*, 640 F.Supp. 1071, 1075 (D.Colo.1986). Section 1103(b)(2) states that the Attorney General may contract for or buy an interest in land as soon as *"the lawful owner of that interest fixes a price for it* and the Attorney General considers that price to be reasonable." 8 U.S.C. § 1103(b)(2) (emphasis added).

The language of 8 U.S.C. § 1103(b)(2) is permissive in nature and is phrased more in terms of authorizing the purchase of an interest in land rather than in terms of providing a method by which the Attorney General should negotiate with a landowner. *See id.* Section 1103(b)(3) does not prescribe or require a particular negotiation procedure. This Court, therefore, finds that while 8 U.S.C. § 1103(b)(3) requires the Government to put forth a bona fide effort to negotiate with a landowner, the Government is not limited to using only a specific negotiation procedure. The Government can fulfill its requirement to engage in a bona fide effort to negotiate in a variety of ways, some of which are set out in this section. This Court foresees no difficulty in applying the bona fide effort standard to whatever method the Government and a landowner use to meet the negotiation requirement of 8 U.S.C. § 1103(b).

§ 224); *see Bajwa v. Sunoco, Inc.,* 329 F.Supp.2d 726, 732 (E.D.Va.2004); *Raney,* 305 F.Supp. at 1156 (W.D.Ark.1969); *see also USG Pipeline Co. v. 1.74 Acres in Marion County, Tenn.,* 1 F.Supp.2d 816, 824–25 (holding that making a monetary offer and demonstrating a desire to acquire easements by negotiation and settlement rather than by eminent domain to be more than sufficient to prove the condemnor made a bona fide effort); *Thornton Dev. Auth. v. Upah,* 640 F.Supp. 1071, 1075 (D.Colo.1986) (finding that the Government's offer and rejection of a counteroffer from the property owner qualified as a reasonable effort). After an unsuccessful attempt has been made, ordinarily, a second effort is unnecessary. *Transcont'l Gas Pipe Line Corp. v. 118 Acres of Land,* 745 F.Supp. 366, 368 (E.D.La.1990); *County of Cascade,* 163 F.Supp. 518, 524 (D.Mont.1958); *but see Kerr v. Raney,* 305 F.Supp. 1152, 1156 (W.D.Ark.1969) (holding a mere perfunctory attempt to purchase an interest does not satisfy a requirement to make a bona fide effort to negotiate).

The amount offered to the landowner "is material only insofar as it may have some bearing on the question of whether the condemnor was in good faith." *See Transcont'l Gas Pipe Line Corp.,* 745 F.Supp. at 369. The negotiation condition may also be satisfied where the owner is willing to sell only at a price which the condemning party deems excessive. *Raney,* 305 F.Supp. at 1156. If it becomes apparent that no agreement can be made at a price satisfactory to the condemning party, the condemnor need not make any further effort to reach an agreement. *Id.*

When the record leaves no question as to the actual good faith of the Government, a court has no judicial right to question the methods which the Government saw fit to employ, unless they were "illegal, as a matter of specific legislative prohibition, or of general want of statutory authority, or of inherent and necessary public policy." *United States v. Muschany,* 139 F.2d 661, 664 n. 5 (8th Cir.1944). Nevertheless, a court may direct further negotiations as a condition precedent to condemnation if it finds the negotiations have, so far, been inadequate. *See County of Cascade,* 163 F.Supp. at 525.

The United States correctly contends that the language "unable to agree" from 8 U.S.C. § 1103(b)(3) must be read in the context of historical precedent in condemnation actions. The right to acquire property cannot be made a "barren right by the unwillingness of property holders to sell." *Kohl v. United States,* 91 U.S. 367, 371, 23 L.Ed. 449 (1875). A landowner, thus, cannot prevent the United States from condemning his or her property simply by refusing to sell or by being unwilling to set a price on an interest in his or her property. *See id.* In addition, the amount of compensation paid for an interest in property must be just to both the owner as well as the public taxpayers who pay for it. *See Bauman v. Ross,* 167 U.S. 548, 574, 17 S.Ct. 966, 42 L.Ed. 270 (1897). Under *Bauman* and *Kohl,* a property owner cannot hold out and require the United States to pay a price for an interest far exceeding the market value of the land in an attempt to stop the United States from exercising its sovereign power of eminent domain. The United States asserts that, given this background, the phrase "unable to agree" requires only a factual determination by the condemning authority that the parties would not be able to reach an agreement through further negotiations. *See Nat'l R.R. Passenger Corp. v. Boston and Maine Corp.,* 503 U.S. 407, 423, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992).

This Court finds that the case law by the cited United States fits squarely into the requirements of demonstrating a bona fide

effort to negotiate with a property owner. The United States is not required to purchase an interest in Dr. Tamez's property at an exorbitant price nor withdraw its condemnation action because, at some point, Dr. Tamez may be unwilling to sell her property. The Government is required, however, to put forth a bona fide effort to determine whether an agreement can be reached. The United States must provide this Court with sufficient evidence for it to determine that the Government has made a bona fide effort to negotiate with Dr. Tamez for this interest in her land.

3. The Record Before This Court

The only facts before this court regarding the existence of negotiations are those supplied by Dr. Tamez in her affidavit. (*See generally* Decl. of Tamez). Dr. Tamez's affidavit describes her conversations and contacts with agents of the Department of Homeland Security over approximately the past six months. (*See id.*) The United States contends that Dr. Tamez's response and the affidavit she attached with her response evidence that the United States made contact with her in an effort to negotiate, that further negotiations would be fruitless, and the United States, thus, satisfied any negotiation requirement imposed by 8 U.S.C. § 1103(b)(3). (Docket No. 13, Reply of the United States at p. 9); (*see generally* Decl. of Tamez).

Dr. Tamez's affidavit suggests a somewhat contradictory situation. While she concludes in her penultimate paragraph that no negotiations have occurred (Decl. of Tamez at ¶ 14), the prior paragraphs suggest that she has certainly had multiple contacts with various government officials involved with the construction of the fence. (*Id.* at ¶¶ 2–7). Further, while she objects to the Government's lack of negotiation, she admits that it would be "difficult, if not impossible, to place a monetary value on the intrusion ... given that my family has owned this land for hundreds of years...." (*Id.* at ¶ 15). Dr. Tamez's affidavit, at the very least, strongly suggests that she is unable to fix a price on the interest that the Government is seeking, lending credence to the Government's argument that, at least in this case, continued negotiations would be futile.

Nevertheless, in the absence of any evidence to the contrary from the Government, this Court holds that, at least in Dr. Tamez's case, the United States has either not complied with the requirements of 8 U.S.C. § 1103(b) or has not provided this Court with sufficient proof that it complied. The Court will, therefore, give the Government two weeks from the entry of this order (until Friday, March 21, 2008) to either: (1) supplement its proof or (2) conduct good faith negotiations with Dr. Tamez (or her representative as she is now represented by counsel), and supplement its pleadings.[10] After that date the Court will proceed to rule on the merits of this aspect of the Government's petition for relief.

C. The Consultation Clause in the Consolidation Appropriations Act of 2008

Dr. Tamez asserts that the Consolidated Appropriations Act of 2008, Pub.L. 110–161, 121 Stat. 2090 (2007), creates an additional mandate with which the Department of Homeland Security must comply prior to filing a condemnation action. The Appropriations Act amended the note to 8 U.S.C. § 1103 by adding, among other provisions, the a consultation clause and savings provision. Consolidated Appropriations Act of 2008, Pub.L. 110–161, 121 Stat. 2090 (2007).[11] The consultation provision

10. Of course, Dr. Tamez is also free to supplement her proof during this same time period.

11. The text of the consultation and savings provisions can be found *supra* in Section IV.

was introduced by United States Senator Kay Bailey Hutchinson of Texas as Senate Amendment 2466 to House Resolution 2638. *See* H.R. Res. 2638, 110th Cong. (2007). The report states:

> [The Committee] is aware that the Department [of Homeland Security] has recently begun to consult with States and local government in some affected border communities, and directs the Secretary to continue such consultation or initiate it immediately. The Committee directs that border security fencing and tactical infrastructure installations be implemented in ways that take full advantage of natural terrain and barriers and minimize adverse impacts on the environment and local communities.

*Id.* at 34, 37. Dr. Tamez contends that this provision created an enforceable mandate that the United States must satisfy prior to filing a condemnation action. She relies on *Sierra Club v. Glickman,* 156 F.3d 606 (5th Cir.1998), for the premise that a consultation clause creates a specific, enforceable duty to consult. *Sierra Club* does not discuss the application of a consultation clause within the context of a condemnation action or an associated savings provision and is, thus, inapplicable to this Court's consideration of the consultation clause. *See generally* 156 F.3d 606.

Congress enacted a savings provision along with the consultation clause. *See* Consolidated Appropriations Act of 2008, Pub.L. 110–161, 121 Stat. 2090 (2007). The savings provision must, therefore, be read alongside the consultation clause. The savings provision states that the consultation clause *does not create any right of action nor does it affect the eminent domain laws of the United States.* 8 U.S.C. § 1103 note (Section 102(b)(1)(C)(ii)). A statute must be construed so as not to render any one portion meaningless. *White v. Black,* 190 F.3d 366, 368–69 (1999). Given the language of the savings provision, it does not appear that Congress intended the consultation clause to impact the ability of the United States to proceed in a condemnation action.

In *162.20 Acres of Land,* the Fifth Circuit held that courts must refrain from considering matters of propriety, expediency and policy in condemnation actions, and that "only an express statement by Congress that ... noncompliance is a defense to a condemnation ... would be sufficient to establish such a defense." *United States v. 162.20 Acres of Land, More or Less, Situated in Clay County, Mississippi,* 639 F.2d 299, 304 (5th Cir. 1981). Based on this precedent, only an express authorization from Congress creates a defense to a condemnation action. The language of the consultation clause, especially in light of the savings provision, does not create an express statement that non-compliance with the consultation clause is a defense to this action at this stage.

This Court must now determine how to apply this mandate from Congress to the Secretary of Homeland Security, even though it is not a defense to a condemnation action. In *162.20 Acres of Land,* the Fifth Circuit, after denying the defendants the use of a consultation provision in the National Historic Preservation Act ("NHPA") as a defense to a taking by the Government, stated:

> [W]hile the NHPA does not provide a legal shield of protection against the exercise of condemnation power, it can provide the condemnee with a sword which he may use to seek judicial scrutiny of compliance with the congressional command that adverse impact upon historical features of the condemned land be mitigated. We have stripped the [defendants] of their asserted shield, but they may still, if they choose, wield the sword to enforce compliance.

*162.20 Acres of Land,* 639 F.2d at 305. The Ninth Circuit is in agreement with the Fifth Circuit that while the failure to comply with certain acts may not be a defense to a taking, that failure may very well prove fatal to the eventual construction project:

> NEPA [the National Environmental Policy Act] cannot be used as a defense to the condemnation action.... Actions that fall under the NEPA may immediately follow a condemnation action ... In an appropriate action, the district court may enjoin the proposed road system. The district court can not, however, address the ownership of the land.

*United States v. 0.95 Acres of Land,* 994 F.2d 696, 699 (9th Cir.1993).

It is not incongruous for Congress to mandate a consultation clause yet not allow that clause to be a defense to a taking. *See id.* Such a consultation does not need to occur before the taking is completed by pleadings, filings and orders from this Court, but rather Congress may mandate consultation before the United States exercises its right-of-entry onto the property under its newly-acquired interest in the property. *Id.* at 304–05. This Court is empowered to provide terms and conditions when granting an order of possession following the filing of a declaration of taking that the United States must fulfill prior to entering onto the property. 40 U.S.C. § 3114(d)(1). Given the mandatory language of the consultation clause, that "the Secretary of Homeland Security *shall* consult ...," this Court may find it proper to require compliance with the consultation clause, when appropriate, as a condition prior to entry onto the property after the taking has been completed. *See* 8 U.S.C. § 1103 note (Section 102(b)(1)(C)); *162.20 Acres of Land,* 639 F.2d at 304–305.[12] Nevertheless, this Court finds that the consultation clause as drafted by Congress is not a defense to the Government's acquisition of a property interest.

## VI. SERVICE OF PROCESS

Dr. Tamez asserts for the first time in her answer that the service of process undertaken by the United States pursuant to 40 U.S.C. § 3114 was insufficient. (*See* Answer of Dr. Tamez, Docket No. 19). Service in condemnation actions is governed by Federal Rule of Civil Procedure 71.1(d). Dr. Tamez does not specify what was insufficient with regard to the United States' service of process in this action. Therefore, as presented, Dr. Tamez's concerns regarding the service of process in this action do not create a defense to the United States' motion for possession.

## VII. CONCLUSION

Upon consideration of the motion and pleadings of the United States and the responses from Dr. Tamez, this Court finds that: (i) the United States' use of the Declaration of Taking Act in this action is proper because the United States is authorized to proceed under the General Condemnation Act, 40 U.S.C. § 3113 and the DTA is available as an ancillary procedure; (ii) Dr. Tamez correctly asserts that negotiations are a prerequisite to the exercise of the power of eminent domain under 8 U.S.C. § 1103 and there is contradictory and insufficient evidence before this Court as to whether there has been

12. This Court realizes that, given the nature of the eminent domain scheme implemented by the Government, there may, in fact, be two takings (one for the exploratory easement and one when the Government actually seeks to move forward on construction). This may require multiple consultations in some cases. In other instances, given the remoteness of the property interest and lack of use by the landowner, there may be no need for extensive consultation. Furthermore, the consultation may be part and parcel of the negotiations between the property interest owner and the Government.

bona fide efforts to negotiate with Dr. Tamez; (iii) the consultation clause of the note to 8 U.S.C. § 1103 is not a defense to the United States' DTA action, but that it still may be a defense to later activity by the Government; and (iv) as presented, Dr. Tamez's unsupported and non-specific contention that service of process was insufficient is not a defense to the United States' DTA action.

Consequently, the Court hereby overrules Dr. Tamez's objections to: (1) the use of the DTA; (2) the failure to comply with the consultation clause; and (3) the sufficiency of the service of process. Dr. Tamez's objections concerning the failure of the Government to abide by the consultation clause are denied without prejudice to her ability to reassert those objections at a later point in time. The Court reserves its ruling with regard to whether the facts demonstrate a bona fide effort to negotiate until March 22, 2008. Both parties have until Friday, March 21, 2008 to either partake in negotiations and/or provide this Court with any relevant evidence they may have concerning the existence of bona fide efforts to negotiate.